## TRIANGLE LUMBER COMPANY *v.* ACREE.

### Opinion delivered April 20, 1914.

1. MASTER AND SERVANT—INJURY TO SERVANT—NEGLIGENCE.—In an action for damages against the master for personal injuries sustained by reason of plaintiff being struck and injured by the tongs used to haul up logs in a saw mill, evidence held not to show that plaintiff was standing in a place where he should not be, that he had gone beyond the line of his employment, or that he assumed the risk of the accident which caused the injury. (Page 543.)

2. EVIDENCE—TESTIMONY OF PHYSICIAN—COMPETENCY.—A physician will not be permitted to testify as to his opinion, if his opinion is founded in part upon information acquired during the existence of the relationship of physician and patient. (Page 544.)

3. EVIDENCE—PHYSICIANS PRESENT AT TRIAL.—In an action for damages for personal injuries, where plaintiff's injury consisted of broken bones in his leg, it is prejudicial error to refuse to permit physicians who were present at the trial, and observed plaintiff while testifying as a witness in the case, to state their opinion as to the nature and extent of plaintiff's injury, based upon their observation of plaintiff during the trial, when he exhibited his leg to the jury, notwithstanding the fact that these physicians had at one time attended plaintiff, since his injury, in a professional capacity. (Page 544.)

4. EVIDENCE—PHYSICIAN AND PATIENT—PHYSICIAN AS A WITNESS.—In order for a physician to be an incompetent witness, the relation of physician and patient must have existed between him and the person, as to whose statements, symptoms or condition he is called to testify, at the time when he acquired the information which he is called on to disclose; and so a physician may testify as to what he observed or learned as to a person's condition before the relation of physician and patient was established between himself and such person, or as to matters which transpired or which he observed after the relation had ceased. (Page 548.)

5.  APPEAL AND ERROR—PREJUDICIAL ERROR—REMITTITUR.—Where no
    error has occurred at the trial, except that judgment has been
    rendered for an excessive amount, that error is cured by reducing
    the judgment to such an amount as is warranted by the evidence.
    (Page 549.)

6.  APPEAL AND ERROR—PREJUDICIAL ERROR—REMITTITUR.—Where compe-
    tent and material evidence was excluded at a trial, and an ex-
    cessive verdict rendered, the court will name a sum so low that
    there can be no reasonable ground to believe that a jury of aver-
    age judgment, when given the right to consider the evidence im-
    properly excluded, would allow the plaintiff a less sum, and which
    the court sees is not excessive, and permit the plaintiff, if he
    chooses, to remit the residue.  (Page 549.)

Appeal from Grant Circuit Court; *W. H. Evans,*
Judge; reversed.

STATEMENT BY THE COURT.

Appellee recovered damages against appellant for
personal injuries sustained by him while in its employ-
ment.  He alleged, as his cause of action, that on July
9, 1912, and prior thereto, he was employed by appellant
as fireman of an engine which ran a skidder machine
that was used to drag logs from the woods; that the logs
were dragged by fastening tongs into them; but the ap-
pellant negligently failed to provide good, safe and se-
cure tongs with which that work could be performed; but
furnished to its employees, so engaged, unsafe, defective
and insecure tongs, of which fact the appellant had no-
tice; and that the engineer operating the skidder ma-
chine, knowing appellee to be in a place of danger, where
he was liable to be injured by said tongs pulling out of
the logs, negligently, carelessly and wrongfully so oper-
ated his engine that said tongs were pulled out of the log
and thrown a distance of thirty yards against appellee's
leg, breaking both bones about four inches above the
ankle; that the bones protruded through the flesh and
were driven into the ground; and that appellee suffered
and now suffers great pain and agony, and that he is per-
manently disabled as a result of his injury, and he prayed
judgment for $20,000 damages.

Appellant admitted that appellee was employed as fireman of the engine which operated the skidder, but denied that it was careless or negligent in providing unsafe and defective or insecure tongs, and denied that the said engineer operated the engine negligently, carelessly or wrongfully, and alleged the fact to be that the engineer had no knowledge of appellee's position at the time of his injury; and that appellee had unnecessarily and voluntarily gone to a place where his duties did not require him to go, and where the engineer did not anticipate he would be; and that appellee was guilty of contributory negligence in unnecessarily exposing himself to danger. That appellee knew the hooks frequently pulled out of the logs, and were likely to do so at any time; but that appellee had no duties, the performance of which would expose him to danger on that account. Appellant also. plead assumption of risk and denied the permanency of appellee's injury.

The skidder is a machine used for loading logs and is mounted on a car which runs on a railroad track. The material parts of the machine are the boiler, engine and the drum, upon which the cable is wound. This cable is unwound and pulled out into the woods on one side of the track, and the tongs are fastened to a log and the end of the cable is attached to the tongs. The engineer starts the drum to turning and winds up the cable, and in this way the logs are pulled up to the track where they are loaded on the cars. The tongs are two curved pieces of steel fastened together with a rivet, such as are used by ice men and others. At the time of the accident in question, the leverman or engineer started the drum and the log, which was being pulled, struck a stump, as very frequently happened; and in such cases it was customary, where it was necessary to do so, to pull the log end ways to enable it to pass the obstruction, and sometimes this result could be accomplished by a second pull on the cable. There were four men engaged in these logging operations. One man carried out the cable and tongs and fastened them to the logs; the flagman, sta-

tioned where he could see both the leverman and hooker, and whose duty it is to signal when the log is ready to be skidded to the track; the leverman or engineer, and the fireman, whose duty it was simply to keep up steam.

Appellant insists that appellee would have been in no danger, and would not have been injured had he remained in the place provided for him in the discharge of his duties. Appellee testified, and is corroborated by the testimony of other witnesses, that it was his duty to fire the engine, and that he started for a load of coal, when he stopped at the water keg to get a drink of water. This water keg was in the shade of a small sapling, and appellee stood there for a very short time after he had gotten a drink of water, and while he was thus standing there, some one hallooed at him, when he jumped from the place where he had been standing, but unfortunately jumped in the wrong direction, and was struck by the tongs torn loose from the log to which they had been fastened, and which were hurled through the air.

Appellant asked an instruction numbered 3, which reads as follows:

"It was the duty of plaintiff to exercise proper care for his own safety, and if you believe from the evidence that plaintiff got down from the engine upon which he was employed, and walked and stood seven to ten feet in the direction of the cable and the hooks thereto attached, which were being operated for the purposes of loading logs at the skidder, and further that plaintiff was not within the line of his employment, and that he voluntarily placed himself in this position of peril, then he is guilty of contributory negligence, and can not recover in this action, even though you should find that defendant was negligent in the selection of its tools or implements, or in the operation of same."

But this instruction was refused, as asked, and was modified by the court and given, and as thus modified, read as follows:

"It was the duty of the plaintiff to exercise ordinary care for his own safety, and if you believe from the evidence that plaintiff got down from the engine upon which

he was employed, and walked and stood seven to ten feet in the direction of the cable and the hooks thereto attached, which were being operated for the purpose of pulling logs to the skidder, and that a person of ordinary prudence would not have done so, and further that plaintiff was not within the line of his employment, and that his doing so placed him in a position of peril, then he is guilty of contributory negligence, and can not recover in this action, even though you should find that defendant was negligent in the selection of its tools or implements, or in the manner of doing the work.'' Appellant duly saved his exceptions to this modification.

Appellee testified that he had suffered great agony as a result of his injury, and had also sustained a loss of earning capacity. He introduced Dr. C. E. Bentley, who testified that he lived in Little Rock, and had had vast experience in surgical operations, that he had met and examined appellee a few days before he was called as a witness, and that he made a physical and x-ray examination at the time, and that appellee had an ununited fracture of the large bone of the leg, and that a cure could never be effected until another operation was performed, and that the injured leg was then a half-inch shorter than the other, and after the operation, would be an inch shorter. A Dr. J. B. Shaw expressed substantially the same opinion.

Appellant offered to introduce Dr. W. P. Clark of Pine Bluff, but it was admitted that appellee had been brought to the Davis Hospital in Pine Bluff after his injury, and had there been attended by Doctor Clark. Appellant also offered as witnesses, Doctors Butler and Jones, who had also treated appellee, but objection was made to their testifying, and the objection was sustained. Appellant then offered the three last named doctors as expert witnesses concerning the appellee's injuries. The court sustained the objection of appellee to this testimony. It was then agreed by the parties, and the court, that appellant need not actually place said witnesses on the stand, but might prepare questions and answers, and

insert them in the bill of exceptions, and that all of said questions and answers should be considered objected to, and the objections sustained and exceptions saved, just as though each witness was put on the stand and the questions actually asked.

Appellant requested that said doctors be permitted to examine appellee during the trial, and testify regarding his injuries, but the court refused to permit this to be done.

*Roscoe R. Lynn,* for appellant; *Cockrill & Armistead, Crawford & Hooker, Danaher & Danaher,* and *W. D. Brouse,* of counsel.

1. The evidence is not sufficient to sustain appellee's allegations of negligence, either that the tongs were defective, or that McGarrity, the leverman, knowing appellee's position, negligently operated the skidder.

The happening of the accident, or the flying out of the tongs, raised no presumption of negligence. Where it is merely a matter of conjecture as to what caused an accident, there can be no recovery. 105 Ark. 161.

There is no evidence that the leverman knew where appellee was at the time he attempted to haul in to the track, and the evidence fails to show that he was negligent in operating the machine.

Under the facts as testified to by appellee's own witnesses, the danger was one which he assumed as a matter of law. If he did not realize his danger, it was because he failed to give proper attention to his surroundings. 3 Labatt, Master and Servant, 1246.

2. Instruction 3 should have been given as requested by appellant. As modified and given, it became merely an instruction on contributory negligence, and entirely eliminated from the instruction the rule that, "A servant who is injured while in a place where his duties do not require him to be, can not recover, for the reason that the obligations of his master do not follow him into such a place, or inure to his benefit while he is in it." 3 Labatt, Master and Servant, § 1253; 4 *Id.,* § 1558-b, and

cases cited; 40 Atl. 500; 102 S. W. 888; 117 S. W. 261; 126 N. Y. Supp. 682; 119 Cal. 637; 43 Ill. App. 478.

3. The court should have sustained appellant's request to have the appellee's injuries examined by physicians for the purpose of testifying as experts as to his condition at the time of the trial, and have required him to be so examined, or to have his action dismissed. They were not incompetent for that purpose because of having formerly treated him as his physicians. 4 Wigmore on Evidence, § 2220 and notes; 78 Minn. 98; 80 N. W. 851; 46 Ark. 275; 60 Ark. 481.

4. The court erred in excluding the testimony of the physicians, offered by the appellant as experts, based upon their observation of the appellee at the time of the trial, and of the x-ray photographs which had been introduced in evidence. This testimony was expert in its character, and was not based upon information obtained while attending the patient, or while the relationship of physician and patient existed. The reason for the application of the privilege statute has failed in this case. 4 Wigmore on Evidence, § 2380, pp. 3352, 3358, 3351; 40 Cyc. 2381, 2382, and cases cited; *Id.* 2388; 31 Ark. 684; 23 Am. & Eng. Enc. of L. 89; 123 Ia. 48, 98 N. W. 354; 106 N. W. 208; 73 Cal. 106, 14 Pac. 397; 114 Ia. 377, 86 N. W. 306; 48 N. E. 730, 731; 129 N. Y. 654, 29 N. E. 751.

*W. R. Donham* and *Mehaffy, Reid & Mehaffy,* for appellee.

1. There is ample proof in the record to show appellant's negligence, not only as to the defective condition of the tongs, known to appellant's employees, but also that McGarrity knew of appellee's position, and negligently operated the skidder, especially in giving a second pull after he saw that the log was against the stump.

The law of assumed risk sought to be invoked by appellant, *i. e.,* that a servant assumes the risk incident to his employment resulting from the negligence of his fellow-servants, has been abrogated. 89 Ark. 356.

2.    The court was right in refusing to give instruction 3 in the form proposed, and in giving it in its modified form.

A person is never guilty of negligence when he is doing what a person of ordinary prudence would do under the circumstances.  Plaintiff, as the proof shows, was within the course of his employment carrying coal, and had to go right near where the water was kept for the use of the employees.  Unquestionably he had the right to stop there for a drink of water, and this act did not terminate the relationship of master and servant.  41 N. E. 1051; 117 N. W. 765; 10 Ohio C. C. (N. S.) 329; 99 N. Y. S. 923.  See, also, 4 Labatt, Master and Servant, § § 1806, 1544; 91 Ark. 343; 87 Ark. 396; 81 Ark. 592; 92 Ark. 350; 93 Ark. 564; 75 N. E. 462.

3.    The court exercised a proper discretion in refusing to require appellee to submit to an examination by the physicians proposed by appellant, all of whom had previously examined him and treated him as his physicians.  They were certainly incompetent because of that fact.  Moreover, he offered to submit to an examination by any reputable physician who had not previously treated him, a number of whom could easily have been obtained.  60 Ark. 481; 121 Ill. App. 410; 122 Ill. App. 545; 221 Ill. 254, 77 N. E. 583; 83 N. E. 545; 66 N. E. 462; 107 Md. 681, 69 Atl. 379; 95 Mo. 169; 44 S. W. 89; 76 S. W. 71; 32 N. E. 389; 34 N. Y. S. 1144.

4.    These physicians who were offered by appellant as experts to testify as to appellee's condition had treated him while he was in the hospital at Pine Bluff were clearly incompetent to testify under the privilege statute, as has frequently been held by this court.  There was nothing to be learned by an examination at the time of the trial that they had not already learned by their previous examinations of him while their patient.  Kirby's Digest, § 3098; 98 Ark. 352; 172 S. W. 995; 159 Mo. App. 370, 140 S. W. 767; 170 N. Y. S. 63, 198 U. S. 508; 82 Pac. 209; 81 N. W. 181; 73 Pac. 54; 70 Pac. 852; 89 N. W. 520; 93 N. E. 177; 125 N. W. 621; 67 N. Y. 185.

SMITH, J., (after stating the facts). We think no error was committed by the court in its modification of appellant's third instruction. It is true, as stated by Mr. Labatt, that "a master's duty in respect to furnishing his servant with a safe place in which to work extends to such parts of his premises only as he has prepared for their occupancy while doing their work, and to such parts as he knows, or ought to know, they are accustomed to using while doing it. The application of this principle has frequently prevented recovery in cases where the injury proximately resulted from the fact that the injured servant was occupying a dangerous position merely for his own convenience and accommodation. Under such circumstances, his legal rights are no greater than those of a licensee." 4 Labatt, Master & Servant, § 1558-b, and cases cited. But there is no evidence that appellee had gone beyond the line of his employment, nor does the evidence show that he was injured while in a place where he had no right to be. Appellant does say that no one knew of appelle's presence at the time of his injury, but it does not deny the right of appellee and other employees to go to, and be at, the place where this injury occurred. It states its position in regard to appellee's presence as follows: "He attempts to justify his action by saying that it was necessary to go and get coal, and that he was getting a drink of water at the time. It is undisputed, however, that the operation of actually pulling in the logs requires much the shorter part of the time. It requires much more time to carry the cable out and attach it to the logs, etc. There is no reason why appellee could not have carried his coal and secured his water while there was no danger caused by pulling in a log. His position must have been known to him to have been dangerous; it was not necessary for him to be there, and no one else knew of his dangerous position." It is probably true that it was possible for appellee to have gotten a drink of water and to have carried his coal without being injured, but that is not the test of negligence. This third instruction, as modified, required the jury to find that

appellee exercised ordinary care for his own safety and was within the line of his employment at the time of his injury, before he could recover. If he was within the line of his employment at the time of his injury the relation of master and servant existed, and their relative duties and obligations were to be measured accordingly. Other instructions were given which correctly announced the duties of master and servant respectively, and in regard to the assumption of risk, and the jury must have found that appellant was negligent in furnishing defective tongs and that appellee was in the line of his employment at the time of his injury, and was not guilty of contributory negligence.

We think the evidence abundantly warranted the jury's finding that appellee was engaged in the line of his employment at the time of his injury, if indeed it was sufficient to require the submission of that question to the jury.

Under the agreement in regard to the evidence of Doctors Clark, Butler and Jones, the following answers given by Doctor Clark were inserted in the record:

Q. What did the wound, as exhibited there (before the jury) indicate?

A. Indicated that there was no fracture existing at the present time, or nonunion of the bone of a former fracture.

Q. Please go into detail and explain why it exhibits a union at the present time?

A. The plaintiff forgot himself and crossed his leg, and began a continuous movement of his leg across the knee. With an ununited fracture, there is nothing to hold the leg except skin and muscles. Should such a condition exist, instead of the leg being stiff and straight, as is contended, the foot would have dangled and bent upon the leg. Another reason—the ends of the bones rubbing against one another would irritate the nerve and cause pain, and he would be unable to do it without being conscious of having pain for so doing.

Q.   Please state, whether, upon the limbs being thus crossed, there was anything to continue the union or nonunion, and if there was a union or nonunion of the previously fractured limb, and, if so, what was it?

A.   It showed positive evidence of union because were there nonunion, there would be sagging, or not being able to control the foot; the foot would dangle more or less since there is nothing to hold it under such conditions except muscle and skin.

Q.   Did you notice whether the foot was in proper position with reference to the limb?

A.   Yes; the large toe was on a line with the knee cap, which is always our guide.

This witness heard appellee testify, and in these excluded questions stated various other reasons, based upon his observation of appellee upon the witness stand, for his opinion that there was no nonunion of the bone, and this witness further stated that the x-ray pictures offered in evidence showed a perfect union of the bones.

This witness testified that he owned an x-ray machine, and was familiar with its use and the character of the pictures taken by it. In his answers he explained how these pictures were taken, and stated that the pictures offered in evidence indicated a complete union of the bones.

The questions submitted to, and the answers given by, Doctors Butler and Jones, indicate their concurrence in the opinions expressed by Doctor Clark. As has been stated, none of these witnesses were permitted to testify, even as experts, for the reason stated at the time, and now urged by counsel, that these doctors had attended appellee in a professional capacity and would be unable to disassociate their knowledge as experts from the information they had acquired by their examination and treatment of appellee while attending him in a professional capacity. There was nothing in the record indicating that these physicians would have given answers to the questions asked, which were based even in part upon the knowledge acquired by them during the existence of

the relation of physician and patient. If such had been the case their evidence would have been incompetent for the law is that a physician can not express an opinion at all, if his opinion is founded in part upon the information acquired during the existence of that relationship. *People* v. *Murphy,* 4 N. E. 326.

But nothing in these questions or answers would indicate that this relation had existed between the witnesses and the appellee, and the questions which were asked them had no relation to any information which they might have acquired as appellee's physicians. There was no attempt to show that these witnesses could not diassociate their information acquired in a confidential capacity from their general knowledge on the subject of fractures. These witnesses were present in court when appellee was testifying, as a witness in his own behalf, and their answers were based upon their observation of him during that time, and these questions were so framed as to exclude the necessity of considering any information previously acquired by the physicians. But appellee says that questions were asked these physicians which were not contemplated by the parties at the time of the trial. For instance, that no offer was made in court to interrogate these witnesses in regard to the x-ray pictures, but the record shows that appellee objected to these witnesses testifying at all, for the reason that they were incompetent as witnesses.

In the case of *Miles* v. *St. Louis, I. M. & S. Ry. Co.,* 90 Ark. 485, it was said: "Where a witness is rejected on the ground of his incompetency, it will be unnecessary on appeal to show what he would have testified, as it will be presumed that the witness would have been rejected, no matter how material the evidence might have been." And we must therefore presume in this case that the court would not have permitted these physicians to testify in regard to these x-ray pictures, if they had been interrogated in regard to them. But the witness Clark was actually asked these questions at the trial:

Q. Did you see the limb as exhibited here a while ago?

A. Yes, sir.

Q. What did the wound as exhibited there indicate?

The witness was not permitted to answer that question, nor to testify further, because of the previous relationship between him and the appellee. This question was a competent one, and the witness should have been permitted to answer it, and this is true even though the court correctly refused permission to appellant for these physicians to make a physical examination of appellee.

We think this was peculiarly a case where a physical examination should have been required. Here appellee has recovered a judgment for the sum of $10,000, which is so large as to indicate either that it was the result of passion or prejudice, or that if such was not the case, the jury must have accepted as absolutely true all the evidence of the physicians of appellee who were permitted to testify as to the permanency of his injury, and the future treatment that would be required on that account, and the extent of his suffering. The evidence offered by the appellant, which was excluded by the court, flatly contradicts the testimony of the physicians who did testify, but the jury were not advised of that fact, and the evidence which they heard stood undisputed and unquestioned before them. In the case of *Sibley* v. *Smith,* 46 Ark. 275, it was said: "The rule to be deduced from these cases is that where a plaintiff in an action for personal injuries alleges that they are of a permanent nature, the defendant is entitled, as a matter of right, to have an opinion of a surgeon upon his condition, based upon personal examination." And the rule there announced is affirmed in the case of *Railway Co.* v. *Dobbins,* 60 Ark. 481.

The trial court must necessarily have some discretion in prescribing the time and conditions under which this examination must be made, and the physicians by whom it may be conducted, and the action of the court in allowing or permitting the examination to be made by

any particular physician would not call for a reversal of the case, unless it affirmatively appeared the discretion of the court had been abused, and we do not reverse this case because of the court's refusal to grant the right to appellant to have a physical examination of appellee made by the doctors whose evidence was excluded. But we feel very confident that prejudicial error was committed in forbidding these physicians to state their opinion, based upon their observations of appellee during the trial, when he exhibited his leg to the jury. These witnesses should have been allowed to state their opinions of appellee's condition, based upon their observations of him then and there, for to have answered these questions did not require a physical examination, and none was made. Appellee argues that other physicians might have been secured, either in the town where the trial occurred, or in the neighboring city of Pine Bluff. But these physicians might not have had the opportunity of observing appellee at the trial, which was afforded the witnesses who were excluded. Moreover, if these witnesses were competent, appellant was entitled to the benefit of their evidence.

A question similar to the one now under consideration was involved in the case of *Crago v. City of Cedar Rapids,* reported in 98 N. W. 354. There the plaintiff alleged that the injuries from which he was suffering resulted from a fall which he had sustained, and several physicians were permitted to express their opinions upon both sides of the question, as to the cause of the injury, when a Doctor Rumel was called as a witness, and it was shown that he had been one of plaintiff's attending physicians, and his evidence was objected to on that account. It was agreed there that the record should show that the questions propounded to the other experts had been asked him and the objections separately interposed. Hypothetical questions without referring to or disclosing witness' former employment as her physician were all held incompetent under section 4608 of the Code of that State, which is substantially the same as section 3098 of Kirby's

Digest of the laws of this State, excluding any physician from disclosing any information which he may have acquired from his patient while attending him in a professional capacity, and which information was necessary to enable him to prescribe as a physician. It was there said: "But no communication, confidential or otherwise, was sought to be elicited, and any intention to attempt this was expressly disclaimed. The questions did not refer thereto, directly or indirectly. Manifestly, then, the statute did not authorize the exclusion of the testimony. The record contains no suggestion of the physician's inability to disassociate the facts stated in the questions from what he had learned from his patient. Indeed, the nature of the inquiry seems to obviate any such difficulty." And after holding that the evidence was competent the judgment of the lower court was reversed, because of its exclusion.

The rule is thus stated in 40 Cyc. 2382: "In order for a physician to be incompetent, the relation of physician and patient must have existed between him and the person, as to whose statements, symptoms or condition he is called to testify, at the time when he acquired the information which he is called on to disclose; and so a physician may testify as to what he observed or learned as to a person's condition before the relation of physician and patient was established between himself and such person, or as to matters which transpired or which he observed after the relation had ceased." Other cases sustaining this view are *People* v. *Schuyler,* 106 N. Y. 304, 12 N. E. 783; *Herries* v. *City of Waterloo,* 114 Ia. 377; 86 N. W. 306; *People* v. *Koerner* (N. Y.), 48 N. E. 730, 731; *Fisher* v. *Fisher,* 129 N. Y. 654, 29 N. E. 951.

Other questions are raised and argued in the briefs, but we think it unnecessary to discuss them.

For the error in excluding the opinions of Doctors Jones, Butler and Clark, based upon the observation of appellee in court, the judgment of the court below must be reversed and the cause remanded for a new trial.

ON REHEARING.

SMITH, J. Appellee calls attention to the fact that the evidence, for the exclusion of which the case was ordered reversed, goes only to the question of the amount of damages; and he asks the privilege of exercising the option to remit a sufficient amount of the damages, which were recovered, to cure the error of excluding this evidence. He has the right to do this under the decisions of this court. But, when a remittitur is ordered under these circumstances, the question is not what amount of recovery would be the limit which is supported and justified by the evidence. Where no error has occurred at the trial, except that judgment has been rendered for an excessive amount, that error is cured by reducing the judgment to such amount as is warranted by the evidence. But a different rule obtains in cases where improper evidence was admitted, or competent and material evidence was excluded. The rule in such cases was announced by Justice RIDDICK, in the case *St. Louis, I. M. & S. Ry. Co. v. Adams,* 74 Ark. 326, as follows: "What the court undertakes to do is simply to name an amount so low that there can be no reasonable ground to believe that a jury of average judgment, after considering the evidence, would, when properly instructed as to the law (or when uninfluenced by improper evidence, or, on the other hand, when given the right to consider improperly excluded evidence) allow plaintiff a less sum than that named, and which amount the court can clearly see is not excessive."

Applying this test, we have concluded, in view of the pain which appellee suffered, and of the loss of time and earnings which he sustained, and the expenses of his treatment which he incurred, that he should recover the sum of $2,000. We name this as a sum which is not excessive and which will not prejudice the defendant.

The proof on appellee's part would unquestionably support a verdict for a larger amount, but, as has been said, that is not the test. The evidence is that for several hours he suffered the most excruciating pain, without medical attention, and even after he had reached the

hospital and had received surgical aid he must still have suffered great pain. Under all the circumstances in proof, we think it unlikely that a jury would assess the damages at less than $2,000.

If appellee shall within one week enter a remittitur of $8,000 to take effect as of the date of the original judgment, the judgment may stand for $2,000 with interest thereon from the date of the original judgment; otherwise, the cause will be remanded for a new trial.