### 8163.  SEABOARD AIR-LINE RAILWAY *v.* HOLLIS.

1. There was evidence to support the verdict.
2. Where a suit for damages against a railroad company is based upon a failure to observe the "blow-post law," what may in fact have been the proximate cause of the injury, and whether it could have been avoided by the exercise of ordinary care on the part of the injured person, are questions of fact for determination by the jury, except where the undisputed testimony authorizes no other conclusion than that the plaintiff failed to exercise ordinary care.
3. The failure of the trial judge to give the jury the requested instruction was not error since the principle involved was covered by the charge given.

DECIDED JULY 23, 1917.

Action for damages; from Muscogee superior court—Judge Gilbert. April 29, 1916.

*Henry R. Goetchius, William deL. Worsley,* for plaintiff in error.
*G. Y. Tigner, A. W. Cozart,* contra.

WADE, C. J.  Hollis instituted a suit for damages against the Seaboard Air-Line Railway, on account of personal injuries, and. because of the destruction of an automobile in which he was riding, in a collision with a passenger-train of the defendant at a public crossing on a country road.  He predicated his right to re-

cover upon the alleged failure of the defendant to observe the "blow-post law" (Civil Code of 1910, § 2675), by blowing the whistle of the locomotive and continuing to blow it while approaching the said crossing and until the crossing was reached, and simultaneously checking and continuing to check the speed of the train, so as to have it under such control as to avoid colliding with any one who might be crossing or attempting to cross the track at the crossing; and asserted that the defendant ran its train across the public road at the crossing at the high and dangerous rate of speed of forty miles per hour. He alleged in his petition that as he neared the crossing he was prevented from seeing the approach of the train, because of certain obstacles adjacent to the track, and that he had no knowledge of its approach and no reason to expect its presence, since no signal or warning of its approach was given as required by law. The defendant denied that it had failed to comply with the "blow-post law," and asserted that the plaintiff, at the time of the alleged injury, was accompanied by another man and two women, and that all of the party had been drinking intoxicating beverages, and were in such a state of inebriety as deprived them of the power to exercise ordinary care and diligence. The defendant further alleged, as the proximate cause of the injury, and as constituting a failure to exercise that ordinary care and diligence which if observed would have prevented the occurrence, various acts and omissions on the part of the plaintiff, to wit: his attempting to operate the automobile while incompetent to do so by reason of intoxication; his attempt to go over a public railroad-crossing at a high rate of speed, though he well knew of the location of the crossing; his failure, though knowing the location of the crossing, to slacken speed when approaching it, or to look or listen to ascertain whether a train was approaching. On the trial of the case there was some evidence to support every material allegation of the petition, including proof as to the injury to the person and to the automobile of the plaintiff; and the jury returned a verdict in his favor for $750. The defendant made a motion for a new trial, which was overruled, and the judgment overruling the motion is here for review.

Counsel for the plaintiff in error contend in their brief that "on the point as to blowing, the evidence of the plaintiff was only negative, some of his witnesses stating that they did not hear the whis-

tle sounded, but that it could have blown and they not have no-
ticed." An examination of the brief of evidence discloses that
the engineer in charge of the locomotive testified: "I blew for
the crossing at the blow-post about a quarter of a mile or 400 yards
from the crossing on the right-hand side of the track," and "I
blew two long and two short blasts," and was "within 150 feet of
the crossing when I ceased blowing," and "I shut off steam at the
blow-post and let the engine drift or roll." The fireman of the
engine said: "I am certain the engineer blew the whistle ap-
proaching the crossing. . . Mr. Bellows [the engineer] gave the
usual blow of two long and two short blows approaching the cross-
ing. . . He shut off the steam and let the train roll after we
passed the blow-post. He did not get right up to the crossing
when he was blowing for the crossing,—not until he reached the
crossing. I don't think he blew the whistle all the way from the
blow-post to the crossing. I don't know that he checked and kept
checking the speed of the train. I think the train was getting a
little slower." The conductor also testified that the whistle blew for
the crossing and that the usual regular crossing signals were given,
though he would not swear that the "engineer blew and kept blow-
ing until [they] reached the crossing," and did not remember
"that he checked and kept checking his train. The train ran
about 250 feet past the crossing." One Parkman testified that he
heard the whistle blow for this crossing on the day the accident oc-
curred. On the other hand, the plaintiff, who was certainly in
a position to have heard the whistle, if such a signal was given,
testified: "I never heard any whistle and never heard any
train. I did not hear any whistle blow and never heard any train
at all as I was approaching the crossing. If the whistle was blown,
I did not hear it." Since the evidence placed this witness in a
position in which he must have heard the whistle if it did blow,
and as there is no testimony to suggest that his hearing was
impaired, his testimony amounted to direct and not negative evi-
dence. Some of the witnesses for the plaintiff were uncertain
whether they heard the train blow on this occasion, but Miss Yar-
brough, a witness for the plaintiff, testified positively that she was
a passenger on the train, and "that the whistle did not blow on
approaching that crossing 400 yards east. It did not blow and
did not keep blowing as it approached Shepherd's crossing. It

did not blow until it passed the crossing and began to slow up after it struck the people. It did not check and did not continue to check from the point 400 yards east of the crossing. I did not detect any cessation of speed. The train ran about 250 yards after it struck the people. . . The whistle could not have blown and I not heard it before it got to the crossing. I am sure of that. . . I am positive it did not blow before crossing over the crossing. The train was running pretty fast." Mrs. Bean testified that she was on the train on this occasion, and that "the whistle was not blown 400 yards east of the crossing, nor did it blow or keep blowing as it approached the crossing, nor •check or keep checking its speed. I am certain it did not. . . I would have heard the whistle blow if it had blown, and I would have noticed the train check if it had checked." Miss Cantrell testified for the plaintiff to the same effect as the two witnesses last named, and added: "I know the train did not blow and did not check. I know it because I know it, and because I did not notice it. I will not tell the jury that it might have blown and I did not hear it. I am certain, if it had blown, I would have heard it. The train was running very fast."

A bare reference to this testimony sufficiently demonstrates that there was positive evidence that the whistle of the locomotive was not blown, nor the speed of the engine checked, as the train approached the crossing; and it was the privilege of the jury to accept the testimony of these witnesses in preference of that of the witnesses for the defendant.

Again, it may be mentioned specially, in connection with what is later said in this opinion in reference to this point, that while the testimony of a civil engineer, who was sworn in behalf of the defendant, tended to show that the view to the right in approaching the crossing where the collision occurred was not obstructed so greatly as was indicated by the testimony of the plaintiff, it was the privilege of the jury to accept the testimony of the plaintiff in preference; and it likewise appears that the testimony of the witness Williams materially corroborated the plaintiff's testimony. So that there was evidence tending to support the plaintiff's contention that he could not have seen the approaching train had he looked before he reached the track at the crossing on account of various intervening obstructions, and therefore his failure to make

any effort to see down the track on the right side, especially in view of the other circumstances hereafter discussed, did not amount to a want of ordinary care on his part. Not only did the plaintiff deny that he was intoxicated at the time of the collision, but several witnesses testified that they had assisted in removing him from the scene of the collision while he was unconscious, and that they noticed no odor of liquor or intoxicants about him, and no evidence of whisky on his person or clothing. There was likewise some testimony to the effect that the odor of whisky was noticeable about the plaintiff after he was injured; so that a jury issue was again presented on this point.

The record does not disclose whether the train which collided with the plaintiff's automobile was engaged in interstate commerce or not, and no question as to the constitutionality of the "blow-post law" (Civil Code, § 2675) is raised in this case. This section has been held not violative of the interstate-commerce clause of the Federal constitution. *Southern Railway Co.* v. *Grizzle,* 131 *Ga.* 287 (62 S. E. 177); Southern R. Co. *v.* King, 217 U. S. 524 (30 Sup. Ct. 594, 54 L. ed. 868). A recent ruling involving the constitutionality of this law as applied to railway trains while engaged in interstate commerce has been made by the United States Supreme Court (37 Sup. Ct. R. 640) in the case of *Seaboard Air-Line Ry.* v. *Blackwell,* 16 *Ga. App.* 504 (85 S. E. 686), which was certified to the Supreme Court of Georgia by the Court of Appeals, and was decided by this court in accordance with instructions given by the Supreme Court (143 *Ga.* 237); but it is unnecessary to discuss that ruling, since the point is not presented in the present case.

Failure to comply with the "blow-post law" is negligence per se, if such failure is the proximate cause of the injury. *Southern Railway Co.* v. *Combs,* 124 *Ga.* 1004, 1013 (53 S. E. 508); *Georgia & Alabama Ry. Co.* v. *Cook,* 114 *Ga.* 760 (40 S. E. 718); *Western & Atlantic R. Co.* v. *Strickland,* 114 *Ga.* 133 (39 S. E. 943); *Central Railroad Co.* v. *Golden,* 93 *Ga.* 510 (21 S. E. 68); *Western & Atlantic R. Co.* v. *Young,* 81 *Ga.* 397 (7 S. E. 912); *Central Railroad* v. *Smith,* 78 *Ga.* 694 (3 S. E. 397); *Western & Atlantic R. Co.* v. *Jones,* 65 *Ga.* 631; *Augusta and Savannah R. Co.* v. *McElmurry,* 24 *Ga.* 75. Nevertheless, one attempting to pass over a railroad-track at a public crossing is not excused from the exer-

cise of ordinary care to avoid injury to himself or to escape the consequences resulting from failure on the part of the defendant to observe the requirements of the statute, after such failure is discovered by him. A traveler approaching such a crossing who fails to use the amount of care ordinarily exercised by a prudent person is not thereby precluded from recovery if, after discovering the violation of the "blow-post law" by the defendant, he uses ordinary care to escape the injury. *Comer* v. *Barfield,* 102 *Ga.* 485 (31 S. E. 89); *G., C. & N. Ry. Co.* v. *Mathews,* 116 *Ga.* 424 (42 S. E. 771); *Williams* v. *Southern Ry. Co.,* 126 *Ga.* 710 (55 S. E. 948); *Central of Georgia Ry. Co.* v. *North,* 129 *Ga.* 106 (58 S. E. 647); *L. & N. Railroad Co.* v. *Hames,* 135 *Ga.* 67 (3) (68 S. E. 805).

It is earnestly contended by learned counsel for the plaintiff in error that the evidence in this case clearly indicates that the proximate cause of the injury was the failure on the part of the plaintiff to exercise ordinary care in approaching the public crossing. It is insisted that the testimony from the plaintiff himself clearly establishes this contention. The plaintiff testified that he was hired on the day of the injury by one Downs to carry Downs and two women out riding, and (without following the various movements of the automobile) that when he approached the public crossing over the tracks of the defendant he had reduced his speed and was traveling at not more than four or five miles per hour; that he heard no whistle and did not hear the train approaching; that just before he reached the track he thought about the train, as "it came along about that time in the evening," took out his watch, and observed the time of day, and saw that the train should have already passed and reached the station in Columbus 25 minutes before; that he "knew there was no danger coming from that way" (the direction from which the train came), and he looked in the other direction, towards town, as "the first time [he] could see was towards town," and he saw smoke from the switch-engine in that direction; that his attention was naturally directed towards the left, and he saw that he had plenty of time to get across, ahead of any train on that side, and, as he "started up on the track," he "looked down the other way [towards the right]," and as he did the train was immediately upon him, struck his automobile, knocked him out, and rendered him unconscious, etc. He testified that on

the approach to the crossing where the collision occurred there were "a number of negro houses on the right-hand side, and a fence and some trees and some telegraph poles. The fence runs parallel with the road going right up to the railroad-track. On the right-hand side the fence runs up within 25 feet of the railroad-track, and then makes a corner, and then goes right on alongside of the right of way, running down the track; and there are houses there and some bank. The train kind of comes out of a not very deep cut. You have got to get very near right on the track before you see down the track. A man would have to be within four or five feet of the railroad if he could tell anything about an engine coming west [from the right] on the track and tell which track it was coming on at that point, whether it was the Seaboard Air-Line or some other track, because four hundred yards back that way the road is curving, and you would have to be right up there to tell so you could see it, and see it was on the outside track. There are four or five other railroad-tracks there north of the Seaboard Air-Line track. The trees and poles and fences would cut you off from seeing down the track as you approach the crossing. . . As I approached the track I was watching the switch-engine up the track. . . One could see towards the west but not the east [to the right]." On cross-examination he said that he looked at his watch and it was a quarter to six o'clock, and he knew the train was to arrive in Columbus at 5:30; that he relied on his watch and was satisfied that the train had been gone 25 minutes, though he did not rely on his watch "for crossing the track;" that he did not look to the right, because he relied on his watch, but "did look to the right as quick as [he] got where [he] could;" that it would have been useless to look to the right, as the view was obstructed, but he listened; that he did not look to the right, "because the switch-engine was up to the left. . . I was watching it, and I thought the other train had gone by, is why I did not look to the right. I was watching to see which way the switch-engine was coming. I saw it was coming back towards me. I looked to the right when I started up on the track. I said in the Knight case [growing out of the same occurrence] that I looked carelessly to the right. I meant casually." He testified on the redirect examination that he was sober when he approached the crossing, that he was not a drinking man, had never been intoxicated, and did not drink whisky.

36

The plaintiff in error contends that the only legitimate deduction that could be drawn from this testimony of the plaintiff is that he failed to exercise ordinary care when approaching the railroad-track, in that he did not look in the direction from which the train came, for had he done so he would have discovered its approach and would have been able to avoid the injury.  It is unnecessary to do more than suggest that whether or not the plaintiff was in the exercise of ordinary care, under the circumstances detailed by the evidence, in failing to look towards the right, was a question for determination by the jury, and could only become purely a question of law where but one possible inference could be drawn from the facts in proof.  It will be observed that the plaintiff mentioned the fact that the smoke of a switch-engine was plainly visible on his left as he approached the track, and that his attention was directed to it in determining whether or not he had sufficient time to cross before any train from that direction could reach him, and that he did not look towards the right until he drove upon the track because, according to his watch and to the regular schedule, the passenger-train coming from that direction must have passed already some 25 minutes before, and he therefore had no reason to apprehend the possibility of danger from this side.  There was some testimony besides that of the civil engineer, to the effect that the view to the right was not so obstructed by intervening objects as to prevent a person approaching this crossing, as the plaintiff did, from seeing a train coming from that direction along this track for some distance before it reached the crossing, but the testimony of the plaintiff was positive that his view on the right was obstructed by such objects within a short distance of the track itself, and that this in part accounted for his failure to look towards the right until he was upon the track itself; that "it would have been no use to look to the right," but he did listen, and did not hear the approach of the train nor any whistle blown.  It was held in *Wrightsville & Tennille R. Co.* v. *Gornto,* 129 *Ga.* 204 (58 S. E. 769), that in a suit to recover damages for the homicide of a person killed upon a public railroad crossing by a railroad locomotive that "it is not error to instruct the jury that if they find that, at the time of the occurrence in question, the train of the defendant company was not running on schedule time, they can take that circumstance into consideration in determining whether or

not the deceased had reason to apprehend danger at such time."
The engineer in this case, who testified for the defendant, himself
admitted that the train was 25 minutes later than its schedule time.

Under so much of the testimony as is recited or referred to
above, it was not so clearly made to appear that the plaintiff failed
to exercise ordinary care in looking to the right sooner than he did,
or in exercising proper diligence thereafter in seeking to avoid the
consequences of the negligence per se on the part of the defendant
company, as to require as a matter of law a verdict in favor of
the defendant; but undoubtedly, under some testimony, which the
jury had the right to accept as correct, the plaintiff approached
the crossing at a slow rate of speed, knowing, from an inspection
of his watch at the time, that according to its regular schedule
the passenger-train which ordinarily approached this crossing
"about" this hour from his right side had passed that point 25
minutes before; his attention, as he more nearly approached the
track, being directed towards the left on account of the visible
presence of smoke in that direction, which suggested the possi-
bility of an approaching train; and he was unable to see up the
track on his right side, on account of houses, telephone posts, and
other obstructions, until almost upon the track itself; all of which
would legitimately support the inference that the plaintiff did not
deliberately place himself in a perilous position without the exer-
cise of ordinary care for his own protection. This case on its facts
is entirely distinct from that large class of cases, to be found in
the reports of the Supreme Court and of this court, like the case of
*Thomas* v. *Central of Georgia Ry. Co.*, 121 *Ga.* 38 (48 S. E. 683),
and several cases therein cited, where, as in many other decisions
of the Supreme Court and of this court, it is held that one who
deliberately goes upon a railroad-track in front of an approaching
train, thinking he can cross before the train reaches him, and mis-
calculates its speed, can not recover for injuries resulting from
being run down by the train, notwithstanding the company's serv-
ants may have been negligent in running at a high rate of speed
at that particular point, or in failing to check the speed of the train
at a public crossing. Here there was no question of miscalcula-
tion, after the plaintiff knew of the approach of the train; for, ac-
cording to the testimony of the plaintiff, he not only did not vol-
untarily attempt to cross in front of a moving train, miscalculating

its speed, but was wholly unaware of the approach of the train until it was actually upon him, or, as he graphically described it, until it "looked like the train fell out of the sky"—so close was it as it towered above him at the moment of the collision.

It is insisted by counsel for the plaintiff in error that there is a strong analogy between this case and the case of *Athens Ry. & El. Co.* v. *McKinney*, 16 *Ga. App.* 741 (86 S. E. 83), where a verdict for the plaintiff was set aside because his conduct was held to be the proximate cause of the accident. Under the well-established rule stated in *Americus, Preston & Lumpkin Railroad Co.* v. *Luckie*, 87 *Ga.* 6 (13 S. E. 105), "The plaintiff can never recover in an action for personal injuries, no matter what the negligence of the defendant may be, short of actual wantonness, when the proof shows he could by ordinary care, after the negligence of the defendant began, or was existing, have avoided the consequences to himself of that negligence." In the case of *Athens Ry. & El. Co.* v. *McKinney*, supra, it was held that "Ordinarily it is true, that whether or not the plaintiff could have avoided the consequences of the negligence of the defendant by the exercise of ordinary care, or how far he himself contributed to the injury, are questions for determination by the jury. . . But where it is *apparent, from the evidence of the plaintiff himself* [italics ours] and from all of the surrounding circumstances in proof, that by the exercise of ordinary care the plaintiff could have avoided the consequences to himself caused by the defendant's negligence, *and there is nothing in the record to the contrary* [italics ours], the propriety of a finding by the jury for or against the plaintiff becomes a question of law for determination by the court." It will be noted that in the ruling last quoted, which was invoked by counsel for the plaintiff in error in this case, it is said that the propriety of a finding by the jury for or against the plaintiff, on the question whether or not the plaintiff could have avoided the consequences of the negligence of the defendant by the exercise of ordinary care, becomes a question of law for determination by the court "where it is apparent from the evidence of the plaintiff himself and from all of the surrounding circumstances in proof, that by the exercise of ordinary care the plaintiff could have avoided the consequences to himself caused by the defendant's negligence, and there is nothing in the record to the contrary." The facts in the *Mc-*

*Kinney* case, supra, are quite different from the facts in the instant case. In that case the plaintiff saw the approaching electric-car, but underestimated its speed, as it was running faster than he had ever seen it move along that street. He was proceeding along the track itself "astride" of the right-hand rail, in advance of the car, and admitted that if he had turned to the right side, as he should have done (as it was nearer), instead of the left, when he attempted to leave the railway-track, he could have reached the right side of the street without coming into collision with the street-car, and could have crossed back to the left side of the street after the car had passed, and thus safely approached his destination. There was no obstruction in the way to prevent his turning to the right, and no emergency of any kind to require him to take the longer and more dangerous course in removing himself from the railway-track and from the hazardous position he occupied when he first discovered the approaching car. According to his own testimony, the plaintiff in that case deliberately attempted to remove himself from the car-track in the more hazardous way because he underestimated the speed at which he was going, whereas if he had turned in the other direction "no injury would have occurred and no loss would have resulted to him except the loss of time consequent upon his driving from the middle of the block up to the next cross-street, and there turning in behind the street-car, and, after it had passed, coming on down the opposite side of the street to the hospital." In this case it can not be said, as in the *McKinney* case, that "it is apparent, from the evidence of the plaintiff himself and from all of the surrounding circumstances in proof, that by the exercise of ordinary care the plaintiff could have avoided the consequences to himself caused by the defendant's negligence, and there is nothing in the record to the contrary;" for the evidence of the plaintiff does not compel the conclusion that by the exercise of ordinary care he could have avoided the collision.

Furthermore, in the decision in *Wrightsville & Tennille R. Co.* v. *Gornto,* supra, it was said that "if the train was not on schedule time, surely this fact was a circumstance which the jury might properly consider in determining whether the husband of plaintiff, in approaching the crossing, had reason to apprehend danger." The plaintiff not only had the presence of the switch-engine on that

side as a sufficient cause to direct his attention especially down the track on his left side, but, according to his testimony, his view on the right side was obstructed, and he did not essay to cross the tracks until after he had deliberately examined his watch and ascertained that according to the watch (which kept correct time) the train must have already passed; and in addition the engineer admitted that the train was 25 minutes late at the time the collision occurred. The jury could have inferred from his testimony and from the other circumstances in the case that the plaintiff had no reason to apprehend the approach of danger from his right side at the time he neared the railroad track, and therefore that he exercised the care of an ordinarily prudent person, under all the circumstances, in attempting to cross the tracks without looking for an approaching engine on his right. At all events, there is enough to sustain a finding that the plaintiff was in the exercise of ordinary care, and it can not be said as a matter of law that the undisputed evidence and all the inferences properly deducible therefrom necessarily established the contrary conclusion. The case of *Ga. So. & Fla. Ry. Co.* v. *Adeeb,* 15 *Ga. App.* 831 (84 S. E. 323), cited by counsel for the plaintiff in error, is clearly not in point, as will appear from an examination of the facts in that case.

The amendment to the motion for a new trial presents the two following grounds, which amount merely to an amplification of the general grounds, to wit: "1. The verdict is contrary to law, in that it appears from the testimony of the plaintiff himself that his own conduct in failing to look to the right as he approached the railroad track was the proximate cause of the injury. 2. The verdict is contrary to law because by exercising ordinary care, to wit, looking to the right as he approached the track, the plaintiff could have avoided the consequences of the negligence (if any) on the part of the defendant." The 3d and sole remaining ground of the amendment to the motion for a new trial complains of the refusal of the court to charge the jury as follows: "Although the jury may believe that the railroad company was guilty of negligence in not observing the law regulating the approach to the crossing, if from the evidence you should believe that after that negligence began it was in the power of Hollis to have avoided the consequences of such negligence, by the exercise of ordinary care on

his part, he could not recover." It is unnecessary to discuss the first two grounds, as what has been said above sufficiently indicates the lack of substantial merit therein. Neither is there any merit in the 3d ground, since it appears, from an inspection of the record, that the trial judge repeatedly gave instructions presenting the legal principle embodied in this request, and more than once in a form more favorable to the defendant than the requested instruction. At the very outset the court instructed the jury that "the plaintiff, Mr. Hollis, can not recover, would have no legal right to recover, if the company shall make it appear that its agents have exercised all ordinary care and diligence, or if the injury to Mr. Hollis was done by his own consent, or if the injury was caused by his own negligence, or if both parties were at fault, and Mr. Hollis, by the use of ordinary care, could have avoided the consequences to himself caused by the defendant's negligence, if the defendant was negligent." Again, the court instructed the jury, after giving them the law as to contributory negligence and diminution of the damages in proportion to the amount of default attributable to the plaintiff, that "if, however, he could have avoided the consequences of the defendant's negligence, if the defendant was negligent, by the exercise of ordinary care, he could in no event recover;" without any qualification as to the time when the plaintiff should begin to exercise ordinary care to escape the consequences of the defendant's negligence. Then, after fully informing the jury as to the meaning of the term ordinary care, and instructing them that the duty to exercise ordinary care to avoid injury rested upon Hollis, and the duty to exercise ordinary care to prevent injuring persons that might be upon the railroad crossing devolved upon the railroad company, and after giving in charge the law requiring the engineer in control of the defendant's locomotive to blow the whistle and check and keep checking the speed of his train so as to stop in time should any person or thing be crossing the railroad-track at a public crossing, the court gave the following instructions: "This rule which requires one to avoid the consequences of another's negligence doesn't apply until he sees the danger, or has reason to apprehend it, and when there is sufficient interval of time to guard against it. He is not bound to anticipate negligence when the law commands diligence for his protection at the hands of another. The plaintiff in this case was not

bound to anticipate negligence, and he was not bound to exercise the degree of care required of him by law until the negligence of the defendant railway company was apparent, or would have been apparent by the exercise of ordinary care upon the part of the plaintiff, Mr. Hollis. Now, if you should believe, from the evidence, that if, by the exercise of ordinary care upon his part, the danger of the railroad company's train (whether its officers, engineers, etc., were negligent or not) would have been apparent, then the law would construe that it was apparent to him, and the duty, as a matter of law, would rest upon him to exercise ordinary care to avoid injury. Now, the railroad company, upon its part, sets up two defenses in this case, to wit, first: that the plaintiff, Hollis, caused the injury by his own negligence; and second, that even if the company, the railroad company, was negligent, that the plaintiff, Hollis, could have avoided the injury by the exercise of ordinary care. The court expresses no view upon that. That is the contention of the defendant. Look to all the evidence and circumstances of the case, and seek the truth. If the plaintiff, Mr. Hollis, himself, caused the injury, he can not recover. If, by the exercise of ordinary care on the part of the plaintiff, Hollis, he could have avoided the effect of any negligence on the part of the defendant, if the defendant was negligent, then in that case the plaintiff, Mr. Hollis, could not recover." And still further, with only a short paragraph intervening, the court instructed the jury as follows: "If, from the evidence, you believe that the plaintiff, Mr. Hollis, could have avoided the consequences of the negligence of the defendant, if you believe that the defendant was negligent, by the exercise of ordinary care on his part, and he failed to exercise such ordinary care, then he could not recover, although the negligence of the defendant, if there was negligence, may not have been actually discovered by the plaintiff, Mr. Hollis, but might have been discovered by him had he exercised ordinary care. The court further charges you, that if the railroad was negligent per se, or otherwise, if that negligence was not the proximate cause of the injury to the plaintiff, then he could not recover."

It appears to us, from an examination of the charge as a whole, that the plaintiff in error can not reasonably contend that the doctrine set forth in the written request to charge, which the court

refused, was not fully, amply, and repeatedly given to the jury in the several portions quoted above.

. The court charged the jury as to the duty of one approaching a railroad crossing in an automobile, to operate his machine at a rate of speed not greater than six miles per hour, and to have the machine under control, and that if negligent in this manner and if such negligence was the cause of the injury, the plaintiff could not recover. And generally the charge of the court so fairly presented the issues in the case that the only exception taken as to the charge was that the trial judge declined to put in the language of counsel, as suggested by their written request, the doctrine repeatedly sub- ·mitted to the jury throughout the charge.

We therefore think the court did not err in refusing the motion for a new trial.

*Judgment affirmed. George and Luke, JJ., concur.*