12414

DRIGGERS v. ATLANTIC COAST LINE R. CO. *ET AL.*

(148 S. E., 889)

(Reversed on Mandate of United States Supreme Court July 9, 1929)

170

172

174

184

190

192

194

200

202

204

206

*Messrs. Hyde, Mann & Figg,* for appellants,

*Messrs. Shimel & Rittenberg, Thos. P. Stoney, A. R. McGowan,* and *J. D. E. Meyer,* for respondent,

March 28, 1928.

The opinion of the Court was delivered by MR. CHIEF JUSTICE WATTS.

"The judgment from which this appeal is taken is one entered upon the verdict of a jury rendered in the Court of Common Pleas for Charleston County on November 12, 1925, in the amount of Twenty-five Thousand ($25,000.00) Dollars and costs.

## "Statement

"This is an action for damages in the amount of One Hundred Thousand ($100,000.00) Dollars, brought in the Court of Common Pleas for Charleston County, under the Federal Employers' Liability Act, as amended (U. S. Comp. St., §§ 8657–8665 [45 USCA, §§ 51–59]), by the plaintiff as administratix of William A. Driggers, deceased,· for the benefit of herself as the widow of the said William A. Driggers, and of her two children. The action is against the defendants, Atlantic Coast Line Railroad Company and M. H. Brandt, and in the pleadings and at the trial it was admitted by both plaintiff and defendants that at the time of the accident to, and injuries and death of the deceased, both the deceased and the defendants were engaged in Interstate Commerce, and that action was brought and maintained under the Federal Employers' Liability Act, as amended, as aforesaid."

The appellant states the questions involved as follows:

"(1) There was no evidence of actionable negligence on the part of the defendants which was a proximate cause of the death of plaintiff's intestate.

"(2) Plaintiff's intestate assumed, as a matter of law, the risk of injury by coming into collision with a train on the main line track when he stepped toward or upon said track, the risk and danger being obvious and apparent, or would have been to an ordinarily prudent person under the circumstances.

"(3) Refusal to strike an allegation in the complaint charging the defendant railroad company with negligence in respect to the presence of billboards and shrubbery not on defendant company's land or right-of-way in charging the jury that the railroad company owed a duty to keep such places unobstructed and that the jury might find negligence in that respect.

"(4) Refusal to charge that under the evidence the presence of alleged obstructions to the view of the deceased, even if negligence, could not, as a matter of law, be the proximate cause of the death of the plaintiff's intestate.

"(5) Refusal to charge a proper request on assumption of risk.

"(6) Error in charging that a servant does not assume any extraordinary hazards or risks.

"(7) Refusal to send the jury to the scene of the accident and abuse of discretion in overruling defendant's motion that the jury be so sent.

"(8) Error in charging that the defendants would be guilty of a violation of law in running their trains at a high and dangerous rate of speed.

"(9) Error in charging that the defendants would be guilty of a violation of law in running a train at an excessive rate of speed.

"(10) Error in charging that it was a violation of law to allow billboards and shrubbery to obstruct the view of the main line tracks.

"(11) Error in charging that it was wrong to run a train at a high or dangerous rate of speed, rule or no rule.

"(12) Error in charging on the facts with reference to the rate of speed of trains.

"(13) Error in charging on the facts with reference to the presence of alleged obstructions near the track.

"(14) Error in refusing to hold the verdict was against the weight of the evidence, and was excessive."

The exceptions raising the question that the Court was in error in not granting a nonsuit or directing a verdict as asked for by the defendants, made on the ground that there was no actionable negligence on the part of the defendants, which was the proximate cause of the death of plaintiff's intestate, we think there was plenty of evidence in the case to justify his Honor's rulings.

The rule for the direction of a verdict in South Carolina has been repeatedly announced as follows: "Under the well-settled rule, if there was any evidence tending to support the defense interposed by defendant, the trial Judge could not properly have directed a verdict. Under the equally well-settled rule, on such motion defendant was entitled to have the evidence considered and construed most strongly in his favor." *Brooks v. Floyd*, 121 S. C., 356, 113 S. E., 490. See also *Wilson v. A. C. L. Railway Co.*, 134 S. C., 31, 131 S. E., 777; *Miller v. A. C. L. Railway*, 140 S. C., 123, 138 S. E., 675.

This has been again stated in the case of *Lower Main Street Bank v. Caledonian Insurance Co.*, 135 S. C., 155, 159, 133 S. E., 553, at page 555: "The well-established rule in this State is that if there is any testimony whatever to go to the jury on an issue involved in a cause, or even if more than one inference can be drawn from the testimony, then it is the duty of the Judge to submit the cause to the jury. This is true, even if witnesses for plaintiff contradict each other, or if a witness himself in his testimony makes conflicting statements."

These exceptions are overruled. It was properly submitted to the jury whether the defendants furnished the deceased a safe place to work.

"On a track where his vision was obstructed by billboards, shrubbery and bushes, and the failure on the part of the engineer to slacken his speed, blow his whistle, keep a proper lookout or to take any precaution to keep his train under control at a place where he knew constant switching was going on, and his failure to take such precaution in the face of the signal he could have seen Conductor McDonald giving to plaintiff's intestate, were acts of negligence, and, certainly, were questions to be submitted to a jury to determine whether or not they constituted negligence." *Mann v. Seaboard Air Line Railway Co.*, 138 S. C., 241, 136 S. E., 234; *Kirkland v. Southern*

*Railway Co.,* 128 S. C., 47, 121 S. E., 594, *Certiorari* denied, 264 U. S., 594, 44 S. Ct., 453, 68 L. Ed., 866; *Padgett v. Seaboard Air Line Railway Co.,* 99 S. C., 364, 83 S. E., 633, affirmed by United States Supreme Court, 236 U. S., 668, 35 S. Ct., 481, 59 L. Ed., 777; *Squire v. Southern Railway Co.,* 109 S. C., 400, 96 S. E , 152; *Thornton v. Seaboard Air Line Railway Co.,* 98 S. C., 348, 82 S. E., 433; *Dutton v. Atlantic Coast Line Railroad Co.,* 104 S. C., 16, 88 S. E., 263, affirmed by United States Supreme Court, 245 U. S., 637, 38 S. Ct., 191, 62 L. Ed., 525.

In the *Dutton case, supra,* affirmed by the United States Supreme Court, this Court held that the "scintilla of evidence" rule is applicable to cases brought under the Employers' Liability Act, and that the same rule of procedure applies to the administration of that Act in the state Court as it does to the administration of state laws. *Free v. Southern Railway Co.,* 78 S. C., 57, 58 S. E., 952.

In the case of *Free v. Southern Railway Co., supra,* this Court said, through Mr. Justice Woods: "As Free was returning across the tracks with water, his attention attracted by an approaching freight train, he was struck and killed by a switch engine coming from the opposite direction on another track. Witnesses variously estimated the speed of the switch engine at from twenty to thirty-five miles an hour, and they all testified there was no watchman on its pilot, and no warning of his approach by bell or whistle. From this evidence the jury might well infer the defendant was negligent in running its switch engine at such a rate of speed in a yard where there were several tracks and the confusion of other moving trains, without a guard on the pilot and without signals; and that in these circumstances, the unfortunate boy in crossing the track in the discharge of the duty assigned to him was not guilty of contributory negligence in not seeing the engine and getting out of its way."

As to failure to apprehend danger when train is not running on schedule time, see *Wrightsville & T. R. Co. v.*

*Gornto,* 129 Ga., 204,, 58 S. E., 770; *Seaboard Air-Line Railway Co. v. Hollis,* 20 Ga. App., 555, 93 S. E., 264, 267.

The question whether or not these acts, if they constituted negligence, individually or jointly and concurrently, were the proximate cause of the death of plaintiff's intestate, presented questions of fact for the jury to determine, and the Court properly submitted these questions of fact for their determination, and they resolved them in favor of the plaintiff. *Milwaukee & St. P. Railway Co. v. Kellogg,* 94 U. S., 469, 24 L. Ed., 256; *Cooper v. Richland County,* 76 S. C., 202, 56 S. E., 958, 10 L. R. A. (N. S.), 799, 121 Am. St. Rep., 946; *Thompson v. Seaboard Air Line Railway Co.,* 78 S. C., 384, 58 S. E., 1094.

In the *Milwaukee & St. P. R. Co. v. Kellogg case, supra,* the Court said: "The true rule is that what is the proximate cause of an injury is ordinarily a question for the jury. It is not a question of science or of legal knowledge. It is to be determined as a fact, in view of the circumstances  *  *  *  attending it."

In the *Thompson case, supra,* our Supreme Court, through Chief Justice Pope, says: "Suffice it to say here that the question of proximate cause is one peculiarly within the province of the jury."

We think that the assumption by the deceased was properly submitted to the jury under the cases of *McAlister v. Southern Railway Co.,* 130 S. C., 458, 126 S. E., 627, *certiorari* denied, 266 U. S., 632, 45 S. Ct., 225, 69 L. Ed., 478; *Hudson v. Atlantic Coast Line Railroad Co.,* 123 S. C., 488, 124 S. E., 584; *Lorick v. Seaboard Air Line Railway Co.,* 102 S. C., 276, 86 S. E., 675, Ann. Cas., 1917-D, 920, affirmed by the United States Supreme Court, 243 U. S., 572, 37 S. Ct., 440, 61 L. Ed., 907; *Pendergrass v. Southern Railway Co.,* 114 S. C., 78, 113 S. E., 150; *Hankinson v. Charleston & W. C. Ry. Co.,* 94 S. C., 150, 77 S. E., 863; *Hall v. Northwestern R. Co. of S. C.,* 81 S. C., 522, 62 S. E., 848.

His Honor was not in error in refusing to strike out ■ that part of the complaint charging the defendant company with negligently permitting the presence of billboards, shrubbery, and bushes. That was a question for the jury whether on railroad property or elsewhere. If they were there, whether on the company's property or elsewhere, and obstructed the view, and the company knew it, it was properly submitted whether under all the facts of the case the company was negligent operating its trains at that particular point so as not to endanger anyone. *Wideman v. Hines,* 117 S. C., 516, 109 S. E., 123.

It was a question for the jury whether it was negli- ■ gent on the part of the defendants to require Driggers to work on a railroad track where his vision would be obstructed by billboards, shrubbery, and bushes, regardless of the fact that the company might have no control over the land on which they were located, because whether or not the company had control over that land, it was its duty to furnish Driggers with a place at which he could safely work, and which was not obstructed by billboards, shrubbery, and bushes.

The language quoted by the defendants from Ruling Case Law under this point (22 R. C. L., 995) is found under a section which discusses the rights between the railroad company and travelers at crossings, and does not in any way cover the question when these obstructions make unsafe the place at which the company's employees are required to work. On the other hand, the principle of the master's liability for dangerous conditions created by third persons near the place of work, as a breach of the duty to provide a reasonably safe place to work, is well established by a number of decisions in the several states. *Boston & M. R. R. v. Brown* (C. C. A.), 218 F., 625; *Doyle v. Toledo, S. & M. Ry. Co.,* 127 Mich., 94, 86 N. W., 524, 54 L. R. A., 461, 89 Am. St. Rep., 456; *Pittsburgh, etc., Railway Co. v. Parish,* 28 Ind. App., 189, 62 N. E., 514, 91 Am. St. Rep.,

120; *Devine v. Delano*, 272 Ill., 166, 111 N. E., 742, Ann. Cas. 1918-A, 689; *Clark v. Union Iron & Foundry Co.*, 234 Mo., 436, 137 S. W., 577, 45 L. R. A. (N. S.), 295.

In *Boston & M. R. R. v. Brown, supra,* the Court of Appeals of the First Circuit, reviewing a case in which a brakeman was knocked off the top of a moving freight car by a bridge near Lawrence, Mass., said: "Although, according to the evidence, this bridge was unusually low, and maintained, not by the defendant the railroad, but by the City of Lawrence, this did not entitle the defendant to the requested instructions that the railroad could not be held negligent with respect to its height. If the passage beneath it was not reasonably safe under all the circumstances, the railroad might still be negligent in continuing to permit the passage of trains beneath it while in such condition."

In *Doyle v. Toledo, S. & M. Ry. Co., supra,* it was held that it is the duty of a railway company to see that a building over its switch track is reasonably safe for employees whose duties call them thereunder, though the building belongs to third persons. In that case the building was the shed of a lean-to, a brick kiln near the railroad's switch track. The railroad had no control over it. The Court based its holding squarely on the doctrine that the railroad owed a duty to provide a reasonably safe place to work and reversed the trial Court, which had directed a verdict for defendant.

In *Devine v. Delano, supra,* the principle was applied to an obstruction alongside the track of the railroad on the premises of a manufacturing plant, the Court saying that if the railroad company had no such control as to be able to remove such dangerous conditions itself, it had to make some arrangements with the owners to change the conditions or had to stop switching at that point.

In *Clark v. Union Iron & Foundry Co., supra,* the Missouri Supreme Court held that one who contracts to erect a building in close proximity to wires carrying a heavy

electrical current owes his employees the duty of determining whether or not the insulation is safe, although his contract gives him no authority over the poles or wires or the space by them. The Court says: "The test is not that the place within itself is reasonably safe, but it must be reasonably safe from all internal and external dangers which are liable to do injury to the servant."

His Honor properly submitted to the jury, on all the facts and circumstances, whether or not there was actionable negligence on the part of appellants, and whether or not that was the proximate cause of the death of plaintiff's intestate.

On the question of assumption of risk the Court charged as follows: "And there is a corresponding duty on the servant. The servant has a right to assume that the master has furnished him a reasonably safe place to work, and he does not have to make any minute inspection, or any investigation. He may assume that the master has performed his duty. But if the place is dangerous—obviously dangerous, and can be seen by the servant, and he goes on and performs his duty after knowing that, why he assumes that risk. He takes the risk on himself, and if he is injured on account of that, he could not hold the master for that. Suppose you were employed by a railroad to work at a certain place. You would have a right to assume that the place was reasonably safe. But if the place was not reasonably safe, was dangerous, the danger was obvious to you, you could see it and knew it, and you undertook to work in that place and you got hurt it would be your fault. Whether that happened in this case I don't know."

In the light of the full instructions given on this point, there was no likelihood of the jury's being misled.

His Honor, the trial Judge, instructed the jury that a servant could not hold the master liable if the place was obviously dangerous and he undertook to work there, and that it was a risk which he assumed, and could not recover

as a result of any injuries sustained by him by reason of the assumption of such risk. *Booth v. J. G. White Engineering Co.*, 101 S. C., 483, 86 S. E., 32; *Harrell v. Columbia Mills*, 112 S. C., 177, 98 S. E., 324; *Mann v. Seaboard Air Line Railway Co.*, 138 S. C., 241, 136 S. E., 234.

The Court properly refused to send the jury to the place where Driggers was killed, and properly exercised its discretion in not requiring the jurors to go there after the jurors advised his Honor that they did not care to go. *Bodie v. Charleston & W. C. Ry. Co.*, 66 S. C., 302, 44 S. E., 943; *Parrott v. Barrett*, 81 S. C., 255, 62 S. E., 241.

In the *Bodie case, supra,* this Court said: "The jury informed his Honor, the presiding Judge, that they had decided that it would be of no benefit to them to visit the place where the accident occurred. It was wholly within the discretion of the presiding Judge whether he would send the jury to view the place where the injury occurred, and under the circumstances, his discretion was properly exercised."

His Honor's language as complained of in charging that certain conduct alleged was in violation of law has given me some trouble, but a careful reading of his charge as a whole convinces me that it was a slip of the tongue and not prejudicial.

His Honor instructed the jury that the specifications of negligence, as charged in the complaint not complied with, were a non-observance of the law, and if the jury believed that plaintiff could recover. It was unfortunate that he used the words in violation of law, but taking his charge as a whole, it was eminently fair and not prejudicial, because the jury could not have inferred from it that appellant was guilty of violating any criminal law or statute.

"They charged that the law required the defendants to do certain things, as sepcified therein, and that they failed to comply with the same, and that they, therefore, became liable for whatever damages the plaintiff sustained as a

result of the failure on their part to comply with these requirements. But the Court jealously guarded the rights of the defendants in so charging and repeatedly told the jury that it was for them to decide whether or not the defendants complied with the law as charged by it, and, if they did not comply therewith, whether or not that constituted negligence, and that even then the plaintiff could not recover unless such negligence was the proximate cause of the injury."

The matter of a new trial was within the discretion of his Honor, and his refusal to grant it will not be disturbed.

All exceptions are overruled, and judgment affirmed.

MESSRS. JUSTICES BLEASE, STABLER, and CARTER concur:

MR. JUSTICE COTHRAN (dissenting) : I think that the motion of the defendants for a directed verdict should have been granted; and, at the least, that serious errors in the charge of the presiding Judge required the reversal of the judgment, and the ordering of a new trial. I therefore respectfully dissent from the affirmance of the judgment indicated in the opinion of the Chief Justice, for the reasons which follow.

The action is by the administratrix of William A. Driggers, deceased, for damages resulting from the wrongful death of the intestate, a brakeman employed upon a switching train by the defendant railroad company, due as alleged to the negligence of the defendants in certain specified particulars.

The case was tried before his Honor, Judge De Vore, November term, 1925, resulting in a jury verdict of $25,000.00 in favor of the plaintiff.

The defendants have appealed upon numerous exceptions, assigning error in the refusal of their motions for a nonsuit and a directed verdict; in the charge of the presiding Judge; in his refusal to allow certain requests to charge; and in other particulars.

The deceased brakeman was killed by collision with the engine of a passenger train, passing on the *south-bound* main line, as he jumped from a switch engine entering the *north-bound* main line from a spur track, pulling a string of 12 or 13 cars.

It is extremely important, in my opinion, to have a clear conception of the *locus* of the unfortunate occurrence, which resulted in the death of the brakeman; this I will endeavor to present.

At the point of the accident about 3 miles north of Charleston, the double tracks of the Coast Line and Southern Railroads are parallel and quite near each other; they run practically due north and south, and for a distance of 2,000 feet toward the north are perfectly straight, with no intervening obstructions to the view; the double track of the Southern lies to the west of that of the Coast Line. (The Southern Railway Company is not involved in this controversy and no further reference need be made to it.) The eastern line of the double track of the Coast Line is used and known as the north-bound main line; the western, as the south-bound.

To one standing south of the point of accident, between the north-bound and the south-bound main lines, facing the north, with his back toward the city of Charleston, the situation is this: Upon his right is the north-bound main line, and upon his left, the south-bound; these lines measuring from the center of each are 12 feet apart; leading from the north-bound main line, from a switch controlled by a lever *on the east side* of that line, in a northeasterly course and on a curve to the right, is a spur track, crossing Meeting Street Road (which is parallel with the railroad), and running to a coal yard, known as the "Etiwan Lead track."

Meeting Street Road, where the Etiwan Lead track crosses it, is following the curve of that track, some 200 feet from the switch at the north-bound main line; between those points there were, at the time of the accident, at a

point about halfway, a billboard and some shrubbery, which
obstructed the view by one at any point between the cross-
ing and the halfway point, of a train approaching the switch
from the north; but between the halfway point and the
switch, a distance of about 100 feet, there was nothing to
obstruct the view, toward the north, for a distance of nearly
three-quarters of a mile, the track as stated being straight.

On the day in question, one McDonald, yardmaster of the
Coast Line (who is commonly spoken of in the record as
"conductor"), with an engine and no cars attached, left the
Charleston Yard for the purpose of transferring certain
cars which were standing on the Etiwan Lead track, to the
Seaboard Railway, at a connection point some distance
north of the point of accident. His crew consisted of him-
self, one Yarborough, engineer (since deceased), a fireman,
and the plaintiff's intestate, Driggers, brakeman. The "light"
engine (that is, an engine with no cars attached) was run-
ning backward. When it reached the switch leading into the
Etiwan Lead track, into which it was proposed to enter
for the cars to be transferred, the conductor stopped the en-
gine, alighted, and turned the switch, standing on the *east*
side of the north-bound main line. The engine was then
backed into the Etiwan Lead track to bring out the 12 or
13 cars which were to be transferred.

It appears that the conductor did not accompany Yar-
borough and Driggers into the Etiwan Lead track, but after
turning the switch, and leaving it open, sent them on to do
the work; he then crossed the double tracks of both rail-
roads, toward the west, and took a position beyond the
Southern's double track and near it, "to look for a train"
that might be coming *from* the south on the north-bound
main line. Driggers, on the Etiwan Lead track, was in his
view, for he states that he saw him shifting the cars to be
transferred, flagging the Meeting Street Road crossing, and
mounting the footboard on the front of the switch engine.

After Driggers had "cut out" a car in the string of cars on the Etiwan Lead track, coupled, coupled up to the cars to be transferred, flagged the crossing, and mounted the footboard of the engine, which then was moving front foremost, pulling the cars, the switching train proceeded toward the switch at the *north-bound* main line (not the *southbound,* as stated in paragraph 3 of the complaint).

The contemplated train movement of the switching train was to enter again the north-bound main line, by the switch which the conductor had left open, pass south of the switch until the last car attached to the switch engine had passed the switch, stop, turn the switch to the north-bound main line, and shove the train of cars up that line to the Seaboard Air Line Railway connection, some distance north of the switch.

Driggers was riding upon the footboard in front of the engine, which was in front of the string of cars; to retain that position until the last car had passed the switch and the engine had stopped meant a walk back the distance of 12 or 13 car lengths, to the switch that had to be turned again. Evidently to avoid this exercise, as the engine was about to enter the north-bound main line at the switch, Driggers was in the act of alighting from it on the right-hand side— the switch was on the left—between the two main lines. The conductor, who was at the position assumed by him "to look for a train," called as a witness *for the plaintiff,* testified: "I heard 79 (the train that struck the brakeman), blow at the Riverside Iron Works, and I wanted to be sure he saw 79. I wanted to give him a signal, and I pointed at the train; he was looking at me; I tried to call his attention to the train. * * * I pointed at the train, told him to stay on the footboard. * * * That same signal would mean we were going to shove to the Seaboard Air Line railroad * * * 79 was coming down the south-bound track; as he stepped off right at this place he stepped into 79 there. * * * As he stepped off the footboard, I

could see an object dangling in the driving-wheel of the engine  *  *  *  he swung into it, the pilot sill of the engine."

As he jumped he ran into the pilot beam of the passenger engine, which is back of the pilot (cowcatcher), was caught by the driving-wheel, and horribly mangled.

In reference to the matter of Driggers' opportunity to observe the approach of the south-bound train that struck him, the same witness for the plaintiff, McDonald, testified that after Driggers had passed a point half-way between the Meeting Street Road crossing and the switch, he would have been clear of the billboard and shrubbery and could have seen a train coming down on the south-bound main line a good deal further up than where the camera for the photograph was placed, 1,000 feet from the switch. This photograph shows that men standing on the Etiwan Lead track, 270 feet from the switch, can be seen from where the camera was placed. The witness (McDonald) testified that if the men shown on the photograph had been standing further up the Etiwan Lead track, they could have been seen, and of course could have seen a train where the camera was placed. From the position occupied by McDonald, he saw the coming train three-quarters of a mile away.

I do not suppose that in the thousands of railroad accidents, a parallel can be found to the extraordinary circumstances which attended the death of the unfortunate brakeman in this case.

The circumstances mainly relied upon, to attribute his death to the negligence of the railroad company, cluster around the operation of the passenger train by the engineer, his conduct in that regard. It is alleged that he was running his train at an excessive and dangerous rate of speed; that he failed to keep a lookout; that he failed to give a signal, a warning of the approach of his train, in view of the prevalence of the custom of switching cars at that point.

The charges against the company are that it failed to furnish the intestate with a safe place to work; in which is included its failure to provide sufficient space between the main lines (north-bound and south-bound) to enable the employees to safely board and alight from trains in the performance of their duties; in permitting the right-of-way of the Etiwan Lead track to be obstructed and screened by billboards and shrubbery.

I. *First as to the charges of misconduct on the part of the engineer:*

The charges should not be entertained unless the evidence at least tends to show that there was a reasonable ground for him to apprehend danger to a brakeman at that point, under the circumstances.

The plat offered in evidence *by the plaintiff* shows that about 10 feet south of the switch for the Etiwan track, there is a switch for a cross-over track from the north-bound main line to the south-bound; but for the intervening 10 feet of north-bound main line track, between the switches, it is a continuation of the Etiwan track.

When the switch for the Etiwan track is turned, a red signal is displayed at a tower south of the switch, which warns a train from approaching the switch on the north-bound main line; and when the other switch, connecting the cross-over track with the south-bound main line, is turned, a similar signal is displayed at a tower north of that switch, for south-bound main line trains.

Upon this occasion the switch connecting the cross-over track with the south-bound main line *was not turned;* in fact, the cross-over track was not needed in the train movement then in progress. Consequently no signal was displayed for south-bound trains; the engineer had of right, a clear track.

So far he was unquestionably within his rights. The red signal for the north-bound main line was away south of the switch; it was not visible to him; and if it had been it would

not have applied to him; he would have been chargeable with notice that the north-bound main line was in use, which of course would have no effect upon his use of the south-bound main line, upon which he had a clear track.

But if it can be said that the Etiwan track, in connection with the north-bound main line, was constantly being used as a switching ground, to such an extent as to charge him with notice that some brakeman would likely be at that locality, in reason he could not have suspected that in the discharge of his switching duties a brakeman would alight between the two main lines, on the *west* side of the north-bound main line, when the switch that he was expected to turn was ten feet away on the east side.

The engineer testified that some distance from the switch he saw the switch train coming out of the Etiwan track "for the north-bound track." He had the right to assume, in the absence of a red signal against his use of the south-bound line, that the activities of the switching train would be confined to the north-bound main line. As a conceded fact, the train movement of the switching train, as contemplated, was to be confined to that line.

Is it just to charge him with the prescience that a brakeman upon the footboard of a switch engine, whose position was unknown to him, would make use of the south-bound main line, or of the space between the two lines, in the discharge of a duty which called him upon the other side of the line, *and run into his train?* I do not think so. Would the engineer under these circumstances be in the slightest danger of a conviction of manslaughter? If his negligence was sufficient to impose a pecuniary liability upon the railroad company, he could not escape from such criminal liability.

Upon the question of the alleged excessive and dangerous rate of speed, I do not think there is a particle of evidence. The point of the accident is not shown to have been within the Charleston Yard, and, if it was, no rule has been admitted in evidence (as the Circuit Judge held) fixing the rate

of speed therein. It is shown by uncontradicted evidence that the engineer had the right, in this locality, to run 40 to 50 miles an hour.

But if it had been shown that the engineer was exceeding the speed limit, it has not been shown that it was the proximate cause of the collision.

The question appears to be concluded by the case of *Patterson v. Director General of Railroads,* 115 S. C., 390, 105 S. E., 746, where this appears in the opinion: "Plaintiff testified that No. 48 came into the yard at a speed of thirty or thirty-five miles an hour, in violation of the rule and city ordinance referred to in the complaint. But he said that the engine and tender of No. 48 had passed the junction of the side track with the main line, so that his engine collided with the first or second car in that train."

Referring to the question of proximate cause, the Court said: "Limiting the fourth ground, as suggested, to the speed of No. 48, we concur in the view that it was not the proximate cause of the injury, because that train did not run into plaintiff's engine, but his engine ran into the train, after its engine [of No. 48], had passed the junction of the switch with the main line. The speed and position of No. 48 was, therefore, only a remote cause of the injury."

II. *Next as to the charge of misconduct on the part of the company:*

The gravamen of this charge is that the company did not provide a safe place for the brakeman to perform the service required of him. In that blanket charge there are specifications:

(a) That the space between the two main lines was insufficient to enable the employees to safely board and alight from the trains;

(b) In permitting the view from the Etiwan track, for trains coming from the north, to be obstructed by billboards and shrubbery, upon the right-of-way between that track and the main line.

(a) *As to insufficient space:* The authorities universally hold that the place as to which complaint is made must have been a place provided by the master for the service. It cannot be assumed, simply from the fact that a servant was injured at a particular place, which the result shows to have been a place of danger, that that was the place provided by the master for him to work; particularly in view of the positive evidence in the case that there were other places perfectly safe.

In *Broadway Co. v. Render* (Ky.), 119 S. W., 198, it is said: "The duty of the master to furnish a reasonably safe place applies only to the place which the employee is *required to use* for the purpose of performing his duty."

In *Harper v. R. Co.,* 131 Ky., 225, 115 S. W., 198, it is said: "But the duty of furnishing reasonably safe appliances and reasonably safe places and premises is confined to the appliances and places and premises with which the servant is *required to work, or in which his duties require him to be."*

In *Smith v. Trimble,* 111 Ky., 861, 64 S. W., 915, the Court said: "And when appellant, without invitation or knowledge of the owner, went into or upon other parts of the premises, not necessary for the performance of his labor, he assumed all the risks of doing so. He was neither required, expected nor allured to be at the place where he was injured, and consequently appellee was under no duty to him to provide there a place of safety."

In *Albert v. McKay & Co.,* 174 Cal., 451, 163 P., 666, the Court said: "The negligence charged in the first count is the failure to comply with the employer's duty to furnish his employee with a reasonably safe place to work. The duty is limited to *'the premises where the employee is required, for the purpose of his employment to be.'"*

In *Harris v. Det Farenede Dampskibselsbab Aktie Selskab,* 75 N. J. Law, 861, 70 A., 155, the Court said: "A master's duty in respect to furnishing his servants a safe place in which to work, extends to such parts of his premises only as

*he has prepared for their occupancy* while doing his work, and to such other parts as he knows or ought to know they are accustomed to use while doing it."

"The duty of a master to furnish a safe and suitable place for his servants to do their work in extends only to such portions of the premises *as he has prepared and designed for their occupancy* while doing his work, and to such other parts as he knows, or ought to know, they are accustomed to use while doing it." *Morrison v. Burgess Sulphite Fibre Co.,* 70 N. H., 406, 47 A., 412, 85 Am. St. Rep., 634.

"A master's duty to furnish his servant with a safe place in which to work, extends to such parts of his premises only *as he has prepared for their occupancy* while doing their work, and to such parts as he knows or ought to know they are accustomed to using while doing it." *Triangle, Lumber Co. v. Acree,* 112 Ark., 534, 166 S. W., 958, Ann. Cas., 1916-B, 773.

"A master's duty in respect to furnishing his servant with a safe place in which to work, extends to such parts of his premises only *as he has prepared for their occupancy* while doing their work, and to such parts as he knows or ought to know they are accustomed to using while doing it." La Batt (1st Ed.), § 1558b.

"The employer is not an insurer of the employee's safety. He is liable for the consequences of his negligence but not of the dangers of the employment." 39 C. J., 260.

It appears to me therefore that the railroad company assumed no obligation whatever to the deceased in the matter of his voluntary effort in attempting to alight between the main lines. The foundation of the plaintiff's claim is that because Driggers selected the place to alight, the railroad company must be assumed also to have selected it and required him to work there.

The fact, if it be a fact, that the deceased may not properly be charged with negligence in not crossing over to the left footboard, where he could have alighted upon the side

where the switch was, does not by any means establish the fact that the company provided or expected him to use the space between the lines for alighting; this is the gist of negligence in this respect.

(b) *As to the billboards and shrubbery:* Giving the plaintiff the benefit of the shortest distance testified to, between the Meeting Street Road crossing and the connecting switch at the north-bound main line, 200 feet, the evidence is overwhelming from the plaintiff's witnesses that the obstruction of vision did not extend further than halfway to the switch, and that for the remainder of the distance, 100 feet, a person at any point on the Etiwan track could have had an unobstructed vision of the south-bound main line for a distance of nearly three-quarters of a mile.

The plaintiff offered in evidence, and it is a part of the record for appeal, a photograph taken from a point on the south-bound main line, 1,000 feet from the switch in question. In that photograph three men appear standing on the Etiwan track 270 feet from the switch, who can be seen, of course, if they are in the picture, from the point where the camera rested. If they can be seen at that point by the eye of the camera, it is indisputable that they could see an engine as it reached the point where the camera rested.

III. I have discussed the case from the standpoint of the negligence of the engineer and of the company; I shall discuss it now from the standpoint of the brakeman's negligence. Whether his conduct may be considered negligent or not, I think that the sole proximate cause of the fatal occurrence was the act of the brakeman.

The rule in the Federal Court, the final arbiter. in cases involving the Employers' Liability Act, is thus stated in the case of *Pheasant v. Director General of Railroads* (C. C. A.), 285 F., 342: "While such negligence is contributory, and evidence of it is admitted under the Federal Employers' Liability Act ordinarily in diminution of damages, it is,

nevertheless, a bar to recovery when it is clear that it was the proximate cause of the injury, or, stating it, perhaps, more accurately, when it appears that the decedent's death was caused solely by his own carelessness"—citing a number of cases including *Linkous v. R. Co.*, 242 U. S., 630, 37 S. Ct., 15, 61 L. Ed., 537.

It appears beyond dispute that the brakeman flagged the Meeting Street Road crossing and mounted the right-hand front footboard of the switch engine which was then moving forward toward the switch—the most favorable position that he could have selected for observation. After he had passed the midway point between the road crossing and the switch, for a distance of at least 100 feet he had a wholly unobstructed view of the south-bound main line as straight as a gun barrel, for not less than 1,000 feet; and the evidence for the plaintiff by the photographer and the conductor of the switch train is to the effect that the point where the camera was placed, 1,000 feet from the switch, could have been seen by a man standing on the Etiwan track 270 feet from the switch. The evidence of the conductor is that standing 15 or 20 feet across the two double tracks, on the west, he could see the coming passenger train for three-quarters of a mile. He heard the whistle of the train away up north of the switch at the Riverside Iron Works.

It seems impossible to conclude otherwise than that Driggers could have both seen and heard the coming train if he had exercised the least degree of care to ascertain whether it was coming or not.

Most probably he concluded that as his work did not naturally call him to the south-bound main line, he had nothing to fear from a train upon that track; if so, was the engineer not entitled to draw the same conclusion? As a matter of fact, his use of the south-bound main line was purely accidental, caused doubtless by the momentum of his own body as he alighted from the moving switch engine. The conductor

significantly testified: "He did not step on the south-bound track; he stepped between the tracks and turned; *he had to get his balance.*" Evidently the switch engine was moving more rapidly than he calculated, and after he alighted between the tracks his momentum carried him into the engine on the south-bound track—an accident pure and simple. Could the enginer be charged with the probability of such an improbable occurrence?

We may never know whether the brakeman saw the coming train or not; it is very sure that his duty did not call him into that death trap; he would have been perfectly safe upon the footboard if he had retained his position there or had waited until the train passed; it is not improbable that a stumble carried him into the engine; as a matter of fact, he was not charged with the duty of turning switches; the conductor testified that it was entirely optional with him. The conductor had turned the switch for the entry into the Etiwan track, and was only 15 or 20 feet from the switch when the train entered the north-bound main line; there was no necessity therefore for the brakeman to take the risk he ran.

IV. But assuming that the accident was not due solely to the conduct of the brakeman, and that it could only be urged by the defendants as contributory negligence, in diminution of the damages, the risk that he ran was either a risk ordinarily incident to his employment, or an extraordinary risk due to the negligence of the defendants.

If an ordinary risk, he must be held to have assumed it, under the principles announced in *Chesapeake & O. R. Co. v. Nixon,* 271 U. S., 218, 46 S. Ct., 495, 70 L. Ed., 914: "If the accident had happened an hour later when the deceased was inspecting the track, we think that there is no doubt that he would be held to have assumed the risk, and to have understood, as he instructed his men, that he must rely upon his own watchfulness and keep out of the way. The Railroad Company was entitled to expect that self-protection from its employees"—citing authorities.

I think that the truth of the matter is that he knew of the train's approach (or certainly, what is the same thing in law, he should have known of it), and anticipated no danger from it on the south-bound main line; that what happened was a contingency which he could not reasonably have anticipated, an accident pure and simple, with the anticipation of which the engineer of the passenger train was not more chargeable than the brakeman was.

If the risk was an extraordinary one, due to the negligence of the defendants, the brakeman must be held alike to have assumed it with the knowledge he had, or should by the exercise of ordinary care have had, of the alleged negligence of the defendants and of the danger thereby created in the attempt which he made.

V. I think that the presiding Judge erred in refusing the motion of the defendant railway company to strike from the complaint subdivision (n) of paragraph 4.

The presence of buildings or other obstructions to vision alongside of a railroad track, upon the land of others, may have a bearing upon the duty of a railroad company to exercise care commensurate with that situation, and upon the opposite party to the controversy as well; but I know of no law which forbids a man from putting up such structures upon his own land as he pleases, or which requires a railroad company to have them removed for the protection of those with whom it may come in contact.

VI. Under the undisputed facts of the case, the defendant railway company was entitled to have its first request to charge presented to the jury.

VII. The fifth request to charge clearly and correctly declared the law of assumption of risk, and should not have been refused.

VIII. The sixteenth, eighteenth, and twenty-second exceptions assign error in charging that the delicts therein referred to constitute *violations of law*. They may have been

*evidence* of negligence without being violations of law. The vice in the charge was classing them with specific statutory regulations, the violation of which constitutes negligence *per se*.

IX. The twenty-fifth exception points out a palpable error. It is so well settled, as to require no authorities, that assumption of risk is of two kinds: (1) The assumption of such risks, not due to any negligence on the part of the master, as are ordinarily incident to the work in which the servant may be engaged; and (2) extraordinary risks, risks due to some failure of duty on the part of the master (negligence), which are known or should be by the exercise of ordinary care, to the servant, and the dangers of which are appreciated by him. In either case the servant is held to have assumed the risk. The charge of the presiding Judge specifically limited the defense to the first class.

There are other errors in the conduct of the trial of which "the time would fail me to tell," but these suffice.

### Order

The mandate of the Supreme Court of the United States, 49 S. Ct., 490, 73 L. Ed., —, having been filed in the above-stated case reversing the judgment of this Court and remanding the case thereto,

*It is ordered* that the above-stated case be remanded to the Court of Common Pleas for Charleston County, with direction to enter judgment in favor of the defendants under Rule 27 of this Court.

By order of the Court:

R. C. Watts,
Chief Justice.

T. P. Cothran,
Eugene S. Blease,
John G. Stabler,
Jesse F. Carter,.
Associate Justices.