### 5584.   GEORGIA SOUTHERN & FLORIDA RAILWAY COMPANY *v.* ADEEB *et al.*

1. The concept of a contract requires that the minds of the parties shall meet and accord at the same time, upon the same subject-matter, and in the same sense. The evidence in the present case authorized the jury to conclude that there was no contract between the alleged contracting parties.

2. Where accord and satisfaction as to the plaintiff's claim against the railway company, for damages on account of personal injuries, are embodied in an instrument signed by her, the purport of which she testifies she did not understand, because of her ignorance of the English language and her inability to read it, and because it was not read to her, and she denies that she entered into any contract whatever with the

railway company, and, while admitting that at the time of the signing money was paid to her, she asserts that she did not accept it on account of any contract, or in satisfaction to any extent of her claim against the railway company, and that she thought she was simply furnishing her name for the convenience or information of the company's agent who requested it, and that she did not understand why the money was given her, a return or tender of the money is not necessary before suit for the damages referred to in the alleged release.

3. The evidence authorized the verdict.

DECIDED FEBRUARY 16, 1915.

Action for damages; from city court of Valdosta—Judge Cranford. February 6, 1914.

. *J. E. Hall, E. K. Wilcox,* for plaintiff in error.

*Whitaker & Dukes,* contra.

WADE, J. Mrs. Louise Adeeb brought her action for damages against the Atlantic Coast Line Railroad Company and the Georgia Southern & Florida Railway Company as joint tort-feasors, alleging that because of the concurrent negligence of both defendants, she had suffered various physical injuries, resulting from a collision at a grade crossing in Valdosta, Georgia, on January 15, 1912, between a train of the Atlantic Coast Line Railroad Company, on which she was a passenger, and a train of the Georgia Southern & Florida Railway Company. Each defendant filed, in addition to a plea to the merits, a special plea setting up that prior to the bringing of the suit the plaintiff had effected with the Atlantic Coast Line Railroad Company a full and complete settlement for the alleged injuries, for a valuable consideration paid by that company and accepted by her as an accord and satisfaction for all such injuries. The issue raised by the special pleas was submitted to a special jury and was determined in favor of the plaintiff. The trial then proceeded, and, at the close of the evidence for the plaintiff, the court granted a nonsuit as to the Georgia Southern & Florida Railway Company, and upon the completion of the entire testimony the jury returned a verdict for $600 against the Atlantic Coast Line Railroad Company. Both the plaintiff and the Atlantic Coast Line Railroad Company filed exceptions pendente lite to the order granting a nonsuit as to the Georgia Southern & Florida Railway Company. The Atlantic Coast Line Railroad Company made a motion for a new trial, on various grounds, and the Georgia Southern & Florida Railway Company filed a motion for a new trial of the issue raised by its special plea of accord and satisfac-

tion.  Both motions for a new trial were overruled, and each de-
fendant excepted to the refusal of the court to grant its particular
motion, and brought its case here for review.  We now have before
us only the question raised by the motion filed in behalf of the
Georgia Southern & Florida Railway Company.  There are no
assignments of error except on the general grounds, and we are to
determine solely if, under the rules of law controlling in such cases,
the verdict in behalf of the plaintiff is supported by evidence, or
was not authorized by the evidence, and therefore was contrary to
law.

The defendant introduced in evidence a written release, dated
January 15, 1912, signed by the plaintiff and witnessed by F. A.
Bates and O. T. Hill, which recited that the plaintiff had a claim
against the Atlantic Coast Line Railroad Company for injury to
her back and side, and for all injuries to her person of every kind
and character, occurring at Valdosta, Georgia, on the 15th day of
January, 1912, under circumstances which she claimed rendered
the Atlantic Coast Line Railroad Company liable (which liability
was denied by the railroad company), and, whereas both parties
desired to effect a compromise, the plaintiff acknowledged the re-
ceipt by her from the Atlantic Coast Line Railroad Company of the
sum of $10, and, in consideration of the payment of this amount
to her, she thereby acquitted, discharged, and released the Atlantic
Coast Line Railroad Company, its agents and employees from any
and all liability on account of such injuries or for any results
therefrom, direct or indirect.  See *Donaldson* v. *Carmichael,* 102
*Ga.* 40 (29 S. E. 135).  F. A. Bates, the conductor in charge of the
train of the Atlantic Coast Line Railroad Company, on which Mrs.
Adeeb was riding when injured, and O. T. Hill, the special claim
agent of that company, both testified that shortly after the collision
they assisted the plaintiff to leave the passenger-coach, and that at
the time she was excited and was crying, and said she was suffering
pain ; that she could speak English, but they "could tell she was a
foreigner;" that they conducted her to a near-by hack and placed
her therein, and Hill got into the hack with her; that after she was
seated in the hack and after the matter had been fully explained
to her, and Hill had read over a printed form of release (except
that no mention was made of the $10 consideration, which Bates
produced), she signed her name thereto with full knowledge that

the same was intended to be in full settlement of any and all damages she had suffered or might suffer on account of the said collision; that they both signed their names to the paper as witnesses, and Bates then handed to Mrs. Adeeb a $10 bill, the amount named in the release, which she accepted and placed in her bag or handsatchel, and which Bates testified he never afterwards saw, and which Hill said "she did not refuse to take when Bates offered it to her;" and that Bates did not throw it into her lap, and he (Hill) did not pick it up from her lap. Bates said that the release was not filled out at the time it was signed, because he did not have pen and ink at the hack, but that he filled in the rest of the agreement after he returned to the station, and "did not put anything in there except what she agreed to." The signature was made with a pencil. Bates further said: "I wrote in the written part of that paper at the station after she had signed it and after I came from the train. None of the writing on this paper was there when she left there except her name. I did not see Hill any more for some time. I put my name down here after the paper was made out; Hill witnessed it at the time. Those names look very much like they were written with the same kind of ink and the same pen." Hill testified that he accompanied the plaintiff to the home of a friend of hers in the city, and there left her.

The plaintiff testified, in broken English, that she was 30 years old, and came from Syria to America 8 years before; that she learned to speak the English language one or two years after she arrived here, but could not read English, though she could "write French, and English is the same write,  .  .  same sort of letters, different ways, that is all." The plaintiff said that on the morning the train was wrecked, "the conductor first see me inside the car. I be in car hollering. The conductor, he told me, 'You hurt;' he said me hurt, and ask me what the matter with me. He said, 'Give me your name, please,' and I said 'Louise Adeeb.' He said, 'How do you spell your last name?' I spell it for him. He told me to sign it down here, and 'I am going to help you get hack.' He make me sit down, make me get me hack; he go after hack; that is what he say; he came back fifteen, twenty, or thirty minutes." Without attempting further to use the exact language of the witness, but giving her testimony in substance and as nearly as possible, she said further that the conductor, or Hill, one of them,

told her to sign the paper; that they took her to a hack, and then the conductor came to her and said, "Sign that paper;" and she told him she could not sign, as she was suffering from the hurt, but he insisted, and she signed. She stated positively that the conductor did not tell her what he wanted her to sign the paper for; and that neither he nor Hill read it to her, and in fact Hill, who was standing near her, never spoke to her at all, and never mentioned the paper; that when she signed the paper she did not know what it was, but, from the fact that the conductor, when he first tried to take her name on the train, said he could not "spell it good," she supposed he wanted her to write her name, and "thought he wanted to take my name to the doctor;" that she could not understand the paper if read to her, and that it was not read to her, and that she did not look at it at the time, as she was suffering, but the conductor urged her to sign it and said he wanted it right away, and insisted, though she told him two or three times that she could not sign, because her "hand do like that" (indicating). She further testified that after she had signed the paper the conductor gave her $10, but she "never take it from him. He said take $10. I said, 'For what is the $10?' He said pay the doctor. I told him railroad pay doctor. He said that the railroad would pay him back that money. I told him I did not want it. He throwed it away—fell in my lap. Mr. Hill, he take it from my lap, and the next time I saw the $10 is the second day after I was hurt." She testified that two days later she told her husband to get some change out of her hand-bag, and he discovered a $10 bill therein; that she supposed that Mr. Hill had perhaps put this bill in her hand-bag on their way from the scene of the accident, as she had never accepted it, and saw him pick up the $10 bill which the conductor had thrown in her lap, but she did not know whether this was true or not, and could not say she herself "had not made the $10," and that it did not in fact properly "belong in that purse;" that Hill took her satchel and carried it for her, as she was unable to carry it herself; that she had a satchel and hand-bag, and the money was in the hand-bag; that she did not see Hill put the satchel down; she lay down on the bed, and she knew nothing further about the satchel until her husband came the next day; that when her husband discovered the $10 bill she thought it was the $10 bill the conductor had thrown in her lap; that the physician who attended

her asked her about the $10 bill and why she signed that paper, and told her that she had "no business to sign that paper," and she told the physician that she "did not know anything about that paper," that she thought the conductor could not sign her last name, and that she did not know if the conductor gave her $10; that she "did not take any money." Dr. Thomas then testified, for the defendant, that he attended the plaintiff as a physician on January 15, 1912, seeing her twice on the day she was hurt, and then every two days, and then no more until four days later—five times in all; that on Tuesday afternoon following the accident, which occurred on Monday, he asked the plaintiff why she signed any paper for the railroad company, and told her she had no chance to recover any damages; that he did not give her any notice that she had signed a release, but told her Mr. Hill had paid her $10 for the release; that he did not remember what she said, or that she told him that she did not know anything about any paper; that he did not pay much attention to it, did not have any paper or explain anything to her, but told her what Hill said he had done; that he did not recall explaining any paper; that Hill had told him in the afternoon, the next day after the collision, that the plaintiff had signed a release.

The plaintiff in error insists that the evidence discloses that $10 was paid to the plaintiff and received by her in consideration of the execution of the release, and that, since she failed to return this amount and to rescind the contract of release as soon as she discovered that a fraud had been perpetrated upon her, and still retained the money, she could not now attack the agreement. The case of *Pennsylvania Casualty Co.* v. *Thompson,* 130 *Ga.* 766 (61 S. E. 829), is relied upon to sustain this view. In that case the Supreme Court said: "In no event could the plaintiff maintain an attack on the release, in the absence of proper allegations in his petition and an offer on his part, prior to the commencement of the suit, to rescind, and a tender back to the defendant of the amount which it had paid in order to obtain such release." In *Jossey* v. *Georgia Southern Ry. Co.,* 109 *Ga.* 439 (34 S. E. 664), the Supreme Court said: "One who signs a contract which recites that in consideration of a stated sum paid him by a railroad company he releases it from all liability for a personal injury, which he contends was caused by its negligence, will be estopped from claiming

that the release is not binding upon him, because he thought when he signed the contract that it related only to the time he lost in consequence of the injury and did not cover damages caused thereby, when it appears that no fraud of any kind was practiced upon him, and that having ample opportunity and capacity to read and understand the contract before he signed it, he negligently failed to do so." In *Petty* v. *Brunswick & Western Ry. Co.,* 109 *Ga.* 666 (5) (35 S. E. 82), it was said: "A contract will not be set aside on the ground of fraud in its procurement, at the instance of one who has neither restored nor offered to restore the fruits thereof." In *Hamilton* v. *Stewart,* 105 *Ga.* 300 (31 S. E. 184), Justice Cobb said: "The retention of the amount forwarded, declared to be in full settlement of the claim held by the person to whom it is sent, coupled with a failure within a reasonable time to decline the proposition, will raise a conclusive presumption of an acceptance of the terms and conditions set forth in the proposal. While of course a party can not be bound by a settlement unless he assents to its terms, still this assent may be implied from the circumstances, and conduct inconsistent with a refusal would raise a presumption of assent, upon which the other party would have a right to act. Nothing could be clearer than the proposition that where one person delivers to another property, to be retained upon a condition stated, the party receiving it can not retain the property and repudiate the condition." In *Strodder* v. *Southern Granite Co.,* 94 *Ga.* 626 (19 S. E. 1022), it was held: "Where an accord and satisfaction is fully executed, the party receiving money from the other can not rescind on the ground of fraud  .   .   without refunding or offering to refund the money which was the fruit of the accord and satisfaction."

There are many other cases along this line, but, on an examination of the case above referred to, as well as others, in which it is held that before a party can rescind or attack a contract or release on the ground of fraud or for any other reason, he must return or offer to return money or property which he has received, it will be seen that the money or property was the fruit of a contract or release which he either actually made and agreed to, or which, because of his acts and conduct in connection therewith, he was presumed by law to have acquiesced in, accepted, or agreed to. There must either have been an actual meeting of the minds of the parties

at the time, or such conduct on the part of one as the law will construe to amount to an acceptance then or afterwards of the proposition made by the other. Where, by fraudulent representations or practice, one has been induced to sign a contract, there is no contract, the minds of the parties having never in fact met; but where the one perpetrating the fraud has paid money as a consideration for the contract, it is well settled, as a general rule, that the other can not retain the money and seek to repudiate the contract. Still, even where the consideration has not been returned by the defrauded party and it is sought to bind him by reason of his retention of the consideration, it must appear that both parties intended to make a contract of *some* sort and character, though it be not such a contract as he understood it to be. And where he had no intention to make an agreement of any kind or description with the other, but his signature was secured to an instrument which he could not read, did not understand, and did not even know was intended for a contract of any kind or character, and he accepted the money without knowing that it was intended as a consideration for the execution of such an instrument, and without connecting the payment of the money in anywise with it, the money, not being in fact received on account of or as a consideration for the pretended contract, need not necessarily be returned before the person so defrauded can attack the pretended contract. It seems clear that where one signing an instrument is unaware that he is making an agreement or contract of any kind with the other, and where money is paid to him by the other person which he receives without supposing it to be in consideration of the execution of *any* contract, there is no relation between the money and the pretended contract, and the return of the money is not a condition precedent to a rescission of the contract. *Butler* v. *Richmond & Danville R. Co.,* 88 *Ga.* 594 (15 S. E. 668).

Applying the law as we understand it to the facts of this case, there seems to be no reason in law or good conscience why the suit of Mrs. Adeeb should be abated because she did not, before bringing her action, return the $10, which, according to her testimony, was thrust upon her by an employee of the defendant company, and which she says she never in fact received or agreed to accept, when it further appears from her testimony that the alleged contract, which the defendant insists she made, was never any contract at

all. According to her testimony, she signed her name to a paper which was not read to her, which she herself was unable to read, and the meaning of which was not explained to her, and did not know that it purported to relate in anywise to the injuries which she had just undergone, or to compensation therefor. She says she thought the conductor "wanted to take [her] name to the doctor," and again that she "thought he wanted to take [her] name and put it in the papers of the conductor." She kept, it is true, the $10, which she testified the conductor threw into her lap, and which Hill picked up, and which she declared she did not know had been paid to her on account of her injuries or in consideration of the signing of a paper, and which she only surmised, when she afterwards discovered it in her satchel, *may have been* the same money thrown into her lap by the conductor and rejected by her. She testified that she did not know that the $10 found in her handbag was in fact the particular $10 offered to her by the conductor, and that if it was in fact the same money, it must have been placed in her satchel by Hill, the claim agent of the company, without her knowledge or consent; and furthermore, that for aught she knew, the $10 found in her hand-bag may have in fact been money *she herself had earned* and which belonged to her.

Under this evidence it does not appear, in the first place, that there was an intention on the part of Mrs. Adeeb to make a contract of any kind with the defendant, or that, at the time she signed the blank form of release, she knew that the defendant intended to bind her thereby in anyway, or even that the payment of $10 to her, if it be conceded that the $10 was actually received by her or was actually retained after she discovered that it had been delivered to her by the defendant, was for and in consideration of her act in signing her name, or was intended to bind her in any way whatever. It appears that she was a foreigner, ignorant of English, probably but little acquainted with business affairs or methods, and possibly obsessed with the idea, said to still predominate in certain remote quarters of the globe, that in this land of the free and home of the brave, currency may be plucked from the trees and gold picked up on the streets, and even after eight years absence from her Syrian birthplace, she may have thought, when the conductor insisted so earnestly upon her acceptance of the $10 bill and even cast it in her lap, as if it were mere negligible dross, that this

amount was paid to her from the overflowing coffers of a benevolent and most generous corporation, and was but an earnest of other and larger benefits to flow from that source in the future — induced by her tears and the obvious excitement and suffering on her part which the conductor, doubtless to her mind a high dignitary of the company, witnessed when he entered the coach immediately after the collision. From her evidence there is nothing to show that Mrs. Adeeb knew or had reason to know, at the time she signed her name to a blank form of release, or when she discovered the $10 bill in her satchel, or when the physician talked to her, or later, either that she had made any contract whatsoever with the railroad company, or that she had been paid anything whatever on account of such agreement.

It is true the evidence is in sharp conflict on this point, but the jury had the right to believe the evidence of the plaintiff in preference to that of the witnesses for the defendants, and they may have judged, from the slight knowledge of English which she betrayed on the witness-stand and from her statement as a whole, that in point of fact she did not understand what she was requested to do when she affixed her signature to the release, and that she never at any time understood for what reason, how, or on account of what consideration, the $10 was paid to her, and that she may have believed and understood that this amount, if she ever felt assured it came from the railroad company, was intended merely as a gift, binding her to nothing whatsoever. The physician who testified that he asked the plaintiff why she had signed the paper, and why she had accepted $10 from the railroad company, said he did not explain to her the nature of the paper he heard she had signed, and he did not testify that she understood from his questions the nature of the paper or why the $10 was paid to her. It appears entirely possible, and in fact probable, that the plaintiff never realized why the defendants claimed the $10 had been paid to her, or why it had been thrust upon her, until after her suit was filed and the special pleas setting up the release and the payment of this amount were interposed by them. Be this as it may, there is nothing to show, that she understood that the $10 was "to be retained upon a consideration stated" (*Hamilton* v. *Stewart,* supra), or that this amount had been paid to her "in order to obtain such a release." *Pennsylvania Casualty Co.* v. *Thompson,* supra.

As to the suggestion that the release could not be attacked without proper pleading on the part of the plaintiff, it is enough to say that the plaintiff was not attacking the release on account of fraud in its procurement, or on any other ground such as was contemplated in *Pennsylvania Casualty Company* v. *Thompson,* supra, but when the *defendants* pleaded the alleged release, she simply replied by her evidence, after the paper had been duly proved by the subscribing witnesses thereto, that she did not make the contract set out therein, or any *other* contract of any kind whatsoever with the plaintiff. Suppose that in a suit on a note the defendant offers in evidence a receipt purporting to have been signed by the plaintiff and setting out a credit made by the defendant on the note sued upon, certainly no pleading on the part of the plaintiff would be requisite in order to admit testimony from him that in point of fact the alleged receipt had never been given by him, and that while his signature was appended thereto, what preceded that signature was written after he had signed his name and without his knowledge, or that he had signed the paper thinking that it was something entirely different and that it bound him to nothing,—perhaps believing it to be a mere testimonial as to his opinion of the personal worth of the defendant. So in this case, had it appeared that Mrs. Adeeb ever made a contract of any kind with the defendant in reference to her injuries, it might have been necessary for her to set up by proper pleadings whatever she claimed in avoidance of her agreement—either that she had been fraudulently induced to sign the same or that she made one agreement and, through accident or mistake, appended her signature to another, entirely different. Here, however, she absolutly denies having made any agreement or contract whatever, but says she simply gave her name to the conductor, and signed it herself because he did not seem to be able to understand how she spelled it, and believing merely that she was informing him on that point.

We think the jury had ample testimony upon which to base their verdict in favor of the plaintiff on this issue, if they elected to accept the testimony of the plaintiff; and it appears that the circumstances surrounding the signing of the alleged release were sufficient to authorize the conclusion reached by them that the plaintiff, in signing the paper and in retaining the $10 placed in her hand-bag, did not at any time understand what she was thereby

doing, and that the conductor and the claim-agent thoroughly understood what *they* intended, desired, and attempted to do. It may be that the unfeeling haste and urgency displayed by the conductor and his colleague in endeavoring to procure the signing of a release by the plaintiff at a time when she was suffering actual pain, and was still nervous and unsettled on account of the collision immediately preceding, to some extent prejudiced the jury against the weight of the testimony given by the conductor and the claim-agent; and it may be that both of these witnesses believed what they testified, that the plaintiff understood that she was signing a release when she appended her signature thereto, and yet, in fact, on account of her limited knowledge of the English language and of legal matters, she did *not* actually understand what the release itself meant or what was meant by the explanation thereof. Suffice it to say, the jury found in favor of the plaintiff, and there was evidence to authorize their conclusion.

*Judgment affirmed. Broyles, J., not presiding.*