## 54547. FONDA CORPORATION et al. v. SOUTHERN SPRINKLER COMPANY, INC.

BIRDSONG, Judge.

The appellants, the Fonda Corporation and its bonder, American Fidelity Fire Insurance Co., bring this appeal from the jury verdict and judgment rendered against them arising out of a contractual dispute between Fonda and its subcontractor, Southern Sprinkler Co., the appellee.

The facts giving rise to this dispute show that Fonda entered into a contract with the Georgia Retardation Center to make certain improvements upon buildings at that agency's location. Included in those improvements were plans for a "dry" fire sprinkler system. The owner of Southern approached Fonda and sought information upon which to make a bid for the sprinkler system. It was noted by Southern that the plans called for a "dry system" using a particular type of sprinkler head. The buildings involved apparently were two-story cottages which were inhabited at all times by retarded persons. Southern's owner, Alexander, climbed into the attic of one of these buildings and concluded that as an inhabited building with some heat filtering up from the area below the attic, there was no reasonable likelihood that the pipes to be installed would be subject to freezing. It was uncontested

that in the space between the first and second floor, which was a heated area, the use of a "return bend," which apparently is a conventional-type drop, would not cause the system to be "wet," as opposed to "dry." We understand from the evidence that the sprinkler system installed by Southern was a "dry" system. It was tapped onto a water line which brought water to the building being protected. At the wall of the building, apparently there was a valve in the water pipe, kept closed by compressed air, which restrained the water from entering the sprinkler pipe system in the building. In the event of a fire, heat would melt the sprinkler head, allowing the air to escape and water to enter the interior pipes and thence through the sprinkler head onto the fire. A "drop" is an extension of pipe that connects a sprinkler head to the water distribution pipe system. The "drop" may accumulate moisture either from condensation or from testing the sprinkler system. The water in a conventional "drop" will not be discharged unless the head is loosened and the water drained or in the event of a fire, the sprinkler head is activated and the water discharged upon the fire. Because of the possible accumulation of water in a conventional drop, a second type drop is available, at a much greater cost, to prevent freezing. This sprinkler head has fabricated with it a drop that prevents any water from the main system entering the drop except in case of fire. Any condensation that may occur in the drop itself is allowed to drain off through a small hole in the sprinkler head.

In the contract in question, the plans and specifications called for a "sprinkler head" schedule and specified that all heads should be equal to "Vikings Model D-Flush Type." Advertising material available to Southern showed Vikings Model D-Flush Type heads consisted of either (1) sprinkler heads with conventional drops that could be used in both a wet or a dry system, or (2) "Type D-2," a more expensive head with a prefabricated drop. It was uncontested that Type D-2 was designed for use in areas subject to freezing. The plans and specifications did not require Southern to use "Type D-2" heads, though it did call for a "dry" rather than a "wet" type head.

After examining the plans and specifications, Southern prepared shop drawings showing the manner in which it would install the system and indicated that it would use return bends or a conventional drop with a Viking Model D-Flush Type sprinkler head. Southern considered that as the conventional drop was being used in a dry system in the first floor which was not subject to freezing, it could use a conventional drop in the attic as well, to service the second floor and the attic, inasmuch as there was no probability of freezing. These drawings were submitted to a state insuring agency for approval, as required by the contract, as well as to the architect and the architect's consulting engineer. Each of these parties approved Southern's proposed work as reflected in the drawings. It appears that the state agency was aware that Southern intended to use conventional drops but that the architect and the consulting engineer failed to note the proposed use of the conventional drop.

Southern commenced the installation of the sprinkler system and had installed basically a dry system including conventional drops throughout one of the buildings. The consulting engineer on a progress inspection noted the use of the conventional drops and informed Southern that the work was not in accordance with the plans and specifications. It was the consulting engineer's understanding that the attic was subject to freezing and that Vikings Type D-2 heads were required in the attic area. Southern was of the opinion that the attic would not freeze and that the type head it was installing was in compliance with the contract. Inasmuch as the dispute could not be resolved because the change would have greatly increased Southern's cost of performance, Fonda terminated the contract with Southern and entered into a contract with a new party who was prepared to use the Type D-2 head.

Southern brought the present suit to recover the $25,911 it had expended in installing so much of the sprinkler system as it had completed prior to being terminated by Fonda. Fonda counterclaimed for the amount of the difference in its construction costs between the Southern contract and the new contract. The jury found for Southern in the amount of $25,911 plus $5,000

in lost profits. Fonda enumerates as error the refusal of the trial court to grant its motion for a directed verdict on its counterclaim and the entry of judgment on the jury verdict in favor of Southern. *Held:*

1. As we view the facts and ultimate issues in this case, it appears to us that Fonda from the beginning intended for Southern to use Type D-2 "dry" heads. It also reasonably appears that the owner, Georgia Retardation Center expected to use "dry" heads together with a dry system because the Center had experienced some freezing, at least in copper pipes, in the attic during the hard freezes of the winter of 1976-77. We also conclude that the contract did not specifically call for the use of Type D-2 heads, but stated that the installer was to use the equivalent of Vikings Model D-Flush Type. We find from the evidence that the working drawings submitted to the architect and his consulting engineer were sufficiently clear to place them on notice that Southern intended to use conventional drops in the attic as well as between the floors, and that Southern intended to install heads other than the D-2 types. However, the architect and consulting engineer were unaware of Southern's intention to install heads other than the D-2 type.

It seems quite clear on the other hand that Southern, from the very first, considered itself in compliance with the terms of the contract by using Model D-Flush Type heads together with conventional drops. Based upon long experience Southern believed that he was installing a "dry" system in an area that was not subject to freezing. Southern maintained the belief that high pressure pipes would not freeze even though thinner copper pipes had frozen in severe cold. Southern's understanding was supported by the approval (albeit mistaken) of its drawings showing the use of conventional drops connected to what was essentially a dry system.

The resulting impasse is a classic case of a failure of two contracting parties to reach a meeting of the minds. Each of the parties to the contract intended to install a dry sprinkler system, but there was no common understanding as to what would constitute the component parts of that system. The contract called for the equivalent of Vikings D-Flush Type dry heads and

Southern was providing D-Flush Type heads connected to a dry system. The provisions of the contract were sufficiently ambiguous as to justifiably entitle each contracting party to reach their respective conclusions. We cannot conclude that the misunderstanding was as to a mere difference in grade, for it is uncontradicted that the D-2 heads were three to seven times as costly as the D-Flush Type without the prefabricated drops. In fact, Alexander testified that to change the type heads would have increased the $101,000 contract bid by more than $50,000. The concept of a contract requires that the minds of the parties shall meet and accord at the same time, upon the same subject-matter, and in the same sense. In the absence of this meeting of the minds, there was no contract between the alleged contracting parties. *Jones v. Ely,* 95 Ga. App. 4 (1) (96 SE2d 536); *Ga. S. & F. R. Co. v. Adeeb,* 15 Ga. App. 831 (1) (84 SE 323) (1915).

2. Though we have concluded that there was no contract between the parties, Southern nevertheless expended almost $26,000 of its own assets in good faith compliance with what it considered its required performance under the purported contract. In our opinion, the loss occasioned by this furnishing of material and labor should be borne by the party who failed to correct the misunderstanding. We are drawn irresistibly to the failure of the architect and his consulting engineer to specify the use of D-2 Type heads in the plans and specifications and their failure to recognize and correct Southern's intended use of D-Flush Type heads with conventional drops as shown in Southern's submitted work drawings. Furthermore, Fonda supported the architect's position rather than attempting to accommodate the apparent error.

We recognize that the parties to this trial did not wish to try the case upon the theory of quantum meruit, but when they attempted to stipulate that quantum meruit was not in issue, the trial court observed ". . . I'm still contending, unless you can show me some law, that we are using quantum meruit but we play like we aren't . . ." Under these circumstances, the theory of quantum meruit is appropriate.

3. We acknowledge that there cannot be an express and implied contract for the same thing existing at the same time between the same parties. It is only when the parties themselves do not expressly agree, that the law interposes and raises a promise. *Ramsey v. Langley,* 86 Ga. App. 544, 549 (4) (71 SE2d 863). We are not limited however by an express contract in this case, inasmuch as we have concluded that an express contract never existed between the parties. Thus, we can rely on the principle that ordinarily, when one renders services valuable to another, which the latter accepts, a promise is implied to pay the reasonable value thereof, and an action to recover the same is one of quantum meruit. *Adair Realty Co. v. Wellman,* 141 Ga. App. 101 (232 SE2d 571); *First Nat. Bank &c. Co. v. McNatt,* 141 Ga. App. 6 (232 SE2d 356); *Martin v. Hendrix & Co.,* 140 Ga. App. 557 (231 SE2d 526).

4. Where no contract exists neither party can recover for an alleged breach thereof by the other. *Eaves v. Cherokee Iron Co.,* 73 Ga. 459 (3). Where there has been, in effect, a repudiation of a contract by both parties in that no contract ever existed, the contract ceases to be the criterion for measuring the rights and liabilities between the parties to it, and work performed, even if not in conformance with the contract, if received and of benefit to the party receiving it, must be paid for at a sum equal to its value. *Ford v. Smith,* 25 Ga. 675 (2, 3); *O'Neil-Dunham, Inc. v. Pearson,* 109 Ga. App. 857, 858 (1) (137 SE2d 556).

5. Though Southern did not plead a count of quantum meruit, it did pray for the value of the services rendered, plus lost profits. The counterclaim sought by Fonda included extra expense caused by the failure of Southern to complete the contract. These issues were clearly submitted to the jury. The Civil Practice Act abolished "issue pleading," substituted in lieu thereof "notice pleading," authorized the pleading of conclusions, and directed that "all pleadings shall be construed so as to do substantial justice." Code Ann. § 81A-108 (Ga. L. 1966, pp. 609, 619; 1967, pp. 226, 230; 1976, pp. 1047, 1048); *Bourn v. Herring,* 225 Ga. 67, 70 (166 SE2d 89); *Nee v. State Farm Fire &c. Co.,* 142 Ga. App. 744, 745 (236

SE2d 880).

6. For the reasons stated above, there was no error in the action of the trial court denying Fonda's motion for a directed verdict. The direction of a verdict is proper only where there is no conflict in the evidence as to any material issue and the evidence introduced, with all reasonable deductions therefrom, shall demand a particular verdict. *State Farm Mut. Auto Ins. Co. v. Snyder,* 125 Ga. App. 352 (187 SE2d 878); *Johnson v. Mann,* 132 Ga. App. 169 (207 SE2d 663). It is permissible only in situations where, if there were a determination the other way, it would have to be set aside by the court. *Sunset Villa v. Mothner-Simowitz Ins. Agency,* 135 Ga. App. 706 (218 SE2d 463). Furthermore, evidence in cases of directed verdicts must be construed most favorably toward the party opposing the motion. *Nationwide Mut. Ins. Co. v. Ware,* 140 Ga. App. 660, 664 (231 SE2d 556). Appropriate grounds for a directed verdict in favor of Fonda did not exist in this case.

7. As the basis for recovery in this case is predicated upon a theory of quantum meruit, the jury's award of lost profits cannot stand. The only valid reason for lost profits necessarily finds its genesis in the contract itself. There being no contract between the parties, there can be no lost profits. Thus that portion of the jury's verdict and the judgment of the court awarding Southern $5,000 lost profits was error and is reversed.

8. Based upon the foregoing, the verdict and judgment of the court below is affirmed on the condition that the plaintiff write off that portion of the verdict and judgment providing for $5,000 lost profits; otherwise, the entire judgment is reversed.

*Judgment affirmed on condition. Deen, P. J., and Webb, J., concur.*

ARGUED SEPTEMBER 8, 1977 — DECIDED NOVEMBER 15, 1977 —
REHEARING DENIED DECEMBER 7, 1977 —

*Ronald N. Winston, Richard H. Siegel,* for appellants.

*Westmoreland, Hall, McGee & Warner, Jack A. Wooton, Clifford Oxford,* for appellee.