## A01A1108. WINGATE LAND & DEVELOPMENT, LLC et al. v. ROBERT C. WALKER, INC.
### (558 SE2d 13)

RUFFIN, Judge.

Robert C. Walker, Inc. ("Walker") sued Wingate Land & Development, LLC, William Douglas Wingate, and Mary Wingate (collectively "Wingate") alleging that Wingate owed Walker compensation for golf course architectural services. Following trial, the jury found in favor of Walker. After a separate bench trial on Walker's claim for litigation expenses, the court also found in Walker's favor. Wingate appeals, asserting the trial court erred in instructing the jury, admitting certain evidence, denying its motion for directed verdict, and entering judgment nunc pro tunc. For reasons that follow, we affirm.

Walker's claims stem from Wingate's development of the Stonebridge Golf & Country Club. In the planning stages, Wingate solicited golf course design proposals from architects, including Walker. In March 1994, Walker submitted a proposed design to Wingate for consideration. The proposal included Walker's standard services contract, which was dated March 29, 1994. The contract proposed a "Total Design Fee" of $165,000 and covered six phases of "Architectural Services," which included "Frequent Construction Inspection Visits & Quality Control" during phase six.

After reviewing the proposal, Wingate informed Walker that it wanted the architect to do the project, but requested that Walker change the pay schedule in the proposed contract. Specifically, Wingate asked Walker to amend the schedule so that a greater portion of the contract price was paid during the latter phases of Walker's performance under the contract. Walker changed the payment schedule as requested. The new schedule required Wingate to pay Walker $5,000 upon execution of the agreement, $5,000 upon completion of phase one, $10,000 upon completion of phase two and $10,000 for phase three, $45,000 upon completion of phase four, $10,000 for phase five, and $20,000 upon completion of each quarter of phase six.

Walker returned the amended contract, still dated March 29, 1994, to Wingate and attached a $5,000 invoice "[f]or the initial payment for Golf Course Architectural Services and execution of agreement fee." Although Wingate did not execute the agreement, following a June 17 meeting between the parties, Wingate paid Walker $5,000.

Walker immediately began drafting golf course plans. As Walker continued its work on the golf course, it invoiced Wingate for the services according to the schedule set out in the March 29, 1994 contract. On July 16, 1994, Walker submitted a $5,400 invoice which stated that it was for reimbursement of expenses and "[f]or the completion of Phase I in accordance with our agreement of March 29, 1994." After receiving the invoice, Wingate paid Walker $5,400. On October 11, 1994, Walker sent Wingate a $10,000 invoice which stated that it was "[f]or the completion of Phase II of our agreement for architectural services," and Wingate subsequently paid that invoice. On January 8, 1995, Walker submitted an invoice "[f]or 50% completion of Phase III, Phase IV and Phase V as per our agreement." The invoice charged $32,500 for "Professional Service Fees Due" and $2,843.22 for expenses. On February 16, 1995, Wingate issued Walker a check for $32,500, which indicated that it was payment of the January 8 invoice. In addition to specifically referencing the phases of work that were covered by each invoice, the July, October, and January invoices clearly provided that they were for golf course architectural services.

Walker continued performing the services required by the March 29, 1994 agreement. As provided in the agreement, the architect completed the plans and construction specifications for the different phases of construction, prepared invitations to bid for the construction, and assisted in the bid conferences. In March 1995, however, the working relationship between Walker and Wingate deteriorated. Wingate complained that Walker was not adequately supervising the contractors and that it was not "on the job on a daily basis." On March 16, 1995, Walker invoiced Wingate $32,500 for completion of

phases three through five. Although Wingate acknowledged that Walker did "a good job" on the invoiced services and that Wingate was satisfied with Walker's performance as an architect, it paid only part of the invoice because of its complaints about "the things that [Walker] didn't do."

Elaborating on his complaints about Walker's performance, William Wingate repeatedly testified that the parties orally agreed that Walker would be Wingate's "project manager" and that there was no written agreement. William Wingate also claimed that Walker had agreed to be Wingate's sole project "consultant" and "construction supervisor," and that Wingate asked Walker to be the general contractor. According to William Wingate: "[Walker] assured me that [it] would furnish the architectural services and [it] would be the — instruction [sic] of the supervisors, and [it] would also assist in help in buying the materials and building stuff, and . . . would be there on a daily basis looking after the building."

On March 14, 1995, Wingate sent Walker a letter reiterating his complaints about Walker's lack of construction supervision and its failure to make daily visits to the site. In the letter, Wingate stated: "[t]his is the basis on which I gave you the job in designing the course, . . . if you are unable to supervise these sub-contractors and be on the job on a daily basis you need to reduce your charges for this project for Architect work only." Wingate subsequently asked Walker to reduce its fee to $100,000 if the architect wanted to stay on the job. Walker completed the project, performing the services required by the March 29, 1994 agreement, and Wingate paid the architect $100,000 for those services.

Walker subsequently sued Wingate for the remaining compensation allegedly owed by Wingate for Walker's services. In its complaint, Walker asserted alternative causes of action for breach of contract, quantum meruit, and for an obligation on a commercial account. Walker also sought to recover its attorney fees on the ground that Wingate had acted in bad faith and had been stubbornly litigious.

On stipulation by the parties, the trial court bifurcated the trial, separating Walker's claim for attorney fees, which was to be tried by the court, from the other claims, which were to be heard by a jury. At the trial on Walker's claims of compensation due for architectural services, the court instructed the jury on all three of Walker's alternative theories of liability. The jury rendered a verdict in Walker's favor. The trial court then conducted a bench trial on Walker's claim for attorney fees and rendered a judgment in Walker's favor.

1. In two enumerations of error, Wingate asserts that the trial court erred in charging the jury on Walker's claim of quantum meruit. Wingate argues that, because quantum meruit applies only

in the absence of a contract, and the parties here agreed there was a contract, the court should not have submitted this claim to the jury. We disagree.

We note initially that Wingate appears to argue that Walker was required to proceed to trial on only one theory of recovery. Georgia law, however, permits a plaintiff to proceed to trial on alternative theories of recovery.[1] As for the theories at issue here, it is true that "[t]here cannot be an express and implied contract for the same thing existing at the same time between the same parties," and that a plaintiff is, therefore, "estopped to recover on quantum meruit where there exists an express agreement."[2] Wingate erroneously assumes, however, that this rule necessarily applied in this case. Although the evidence showed that Walker and Wingate desired to enter into a contract for Walker's services, it also showed that, from the beginning, they disagreed about the type and extent of services required under the agreement. As stated above, at trial Wingate steadfastly maintained that there was no written contract and that the parties orally agreed that Walker was going to be Wingate's "project manager," "general contractor," sole project "consultant," and "construction supervisor." Walker, on the other hand, contended that there was a written contract requiring only architectural services.

Under these circumstances, the jury could have found that Walker and Wingate failed "to reach a meeting of the minds."[3] Such deficiency would mean "that an express contract never existed between the parties," and the jury would have been permitted to consider whether Wingate was liable under quantum meruit.[4] Thus, evidence supported Walker's claim of quantum meruit, and the trial court did not err in charging the jury on this theory of recovery.

2. Wingate also asserts that the trial court erred in charging the jury on Walker's claim of obligation on a commercial account. Specifically, Wingate argues that a claim on commercial account "has no application in a situation where there is a specific contract for a specific amount." In Division 1, however, we concluded that there was evidence from which the jury could have found that there was no contract. Thus, this assertion has no merit.

3. Wingate asserts that, during the bench trial on litigation expenses, the trial court erroneously admitted evidence of disputes

---

[1] See *Franklin v. Gwinnett County Public Schools*, 200 Ga. App. 20, 25 (2) (407 SE2d 78) (1991).

[2] (Punctuation omitted.) *Gerdes v. Russell Rowe Communications*, 232 Ga. App. 534, 537 (3) (502 SE2d 352) (1998).

[3] *Fonda Corp. v. Southern Sprinkler Co.*, 144 Ga. App. 287, 290 (1) (241 SE2d 256) (1977). See also *Sanders v. Commercial Cas. Ins. Co.*, 226 Ga. App. 119, 120-121 (1) (485 SE2d 264) (1997).

[4] *Fonda Corp.*, supra at 292. See also *Sanders*, supra at 121-122.

involving other contractors on the Stonebridge project. Wingate challenges the similarity between the other disputes and the instant one and argues that "[t]he evidence of other business disputes was highly prejudicial but had no probative value on the issue of bad faith."

Wingate has not shown, however, that it objected to the similar act evidence on this ground at trial. Although the record reveals that Wingate moved in limine to exclude similar act evidence on the ground that such evidence is admissible only "if there was fraudulent intent in this controversy," this is not the same argument asserted on appeal. The issue as raised is, therefore, waived.[5]

4. Wingate asserts that the trial court erred in denying its motion for directed verdict on Walker's claim for litigation expenses under OCGA § 13-6-11. According to Wingate, the court's award was improper because the evidence established that a bona fide dispute existed between the parties, and there was no evidence that Wingate acted in bad faith. We disagree.

In reviewing Wingate's assertions, we construe the evidence in a light most favorable to the trial court's judgment and determine whether there is any evidence to support that judgment.[6] "It is not for this Court to determine or to question how the [trial court, as factfinder,] resolved any apparent conflicts or uncertainties in the evidence."[7]

The evidence supported the trial court's judgment. It showed that Walker provided its architectural services to Wingate under a written agreement that did not require daily site visits, construction supervision, or overall project management. In fact, from the time Walker submitted its initial proposal in March 1994, until March 1995 when Wingate sought to reduce Walker's fee, both Walker and Wingate performed consistently with the terms of the March 29, 1994 written agreement. Walker and Wingate negotiated Walker's compensation schedule based on the written agreement, Walker performed the various architectural services required by the agreement and submitted invoices pursuant to the agreement, and Wingate paid Walker in accordance with the agreement. Wingate's complaints arising in March 1995, its denial of a written agreement, and its refusal to pay Walker the balance due under the written agreement are all "contrary to the position it had maintained for [approximately one year]. Under these circumstances, the evidence supported a finding of bad faith."[8]

---

[5] See *Williamson v. Harvey Smith, Inc.*, 246 Ga. App. 745, 750 (6) (542 SE2d 151) (2000).

[6] See *City of Warner Robins v. Holt*, 220 Ga. App. 794, 796 (1) (c) (470 SE2d 238) (1996).

[7] Id.

[8] *Hayes Constr. Co. v. Thompson*, 184 Ga. App. 482, 484 (2) (361 SE2d 865) (1987). See also *Dept. of Transp. v. Dalton Paving &c.*, 227 Ga. App. 207, 218 (5) (489 SE2d 329) (1997)

5. Wingate asserts that the trial court erred in entering judgment nunc pro tunc. The record shows that the trial court signed the final judgment on March 15, 2000, but ordered "that the portion of this judgment related to phase I of the bifurcated trial is entered [n]unc pro tunc to April 12, 1999." It appears that the court intended to give effect to the jury's verdict on the date the verdict was rendered.[9] Wingate argues that if the court or Walker wanted judgment entered on April 12, 1999, they should have then taken the appropriate action, and because they did not, the court was without authority to enter judgment nunc pro tunc. Wingate acknowledges, however, that the Supreme Court's opinion in *Mayor &c. of Savannah v. Champion*[10] permitted the trial court's action in this case. Georgia law expressly authorizes courts "[t]o amend and control its processes and orders, so as to make them conformable to law and justice, and to amend its own records, so as to make them conform to the truth."[11] We find no abuse of that authority here.[12]

6. In two other enumerations of error, Wingate asserts, without any argument or citation of authority, that for the reasons set forth elsewhere in its brief, the trial court erred in denying its motions for judgment notwithstanding the verdict, for new trial, and to set aside the judgment. Lacking citation of authority and argument, these assertions are deemed abandoned.[13]

*Judgment affirmed. Johnson, P. J., and Ellington, J., concur.*

DECIDED OCTOBER 31, 2001 —
RECONSIDERATION DENIED DECEMBER 7, 2001 — 

*Cannon & Meyer von Bremen, William E. Cannon, Jr., McCall, Finney & Phillips, Earl McCall*, for appellants.
*Donaldson, Bell & Pickett, Mark L. Pickett*, for appellee.

---

(bad faith existed where Department of Transportation threatened to withhold payment unless contractor submitted revised plans).

[9] Notwithstanding the court's apparent intent, the record reflects that the jury actually rendered its verdict on April 2, 1999.

[10] 54 Ga. 541, 542 (1875).

[11] OCGA § 15-1-3 (6).

[12] See *Maloy v. Planter's Warehouse &c. Co.*, 142 Ga. App. 69, 74-75 (3) (234 SE2d 807) (1977).

[13] See Court of Appeals Rule 27 (c) (2).